# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **Criminal No.  ELH-19-0115** |
| **JUSTIN AKONOM, et al** | **:** | |
| **Defendant** | **:** | |
| | **:** | |

...o0o...

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENDANTS' PRE-TRIAL MOTIONS

Robert K. Hur
United States Attorney

Jeffrey M. Hann
Special Assistant United States Attorney
Anatoly Smolkin
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Tel.: (410) 209-4800
Fax: (410) 962-3124
Jeffrey.Hann@usdoj.gov
Anatoly.Smolkin@usdoj.gov

Dated:   June 12, 2020

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

PROCEDURAL SUMMARY OF THE CASE ........................................................ 1

STATEMENT OF FACTS ........................................................................................ 3

    A.   Title III Interception of Wire and Electronic Communications of
           Defendant Gary Horton.................................................................................. 3

    B.   Orders Authorizing the Installation of Pen Register/Trap and Trace Devices for
           Telephone Number 443-943-5127. ............................................................... 8

    C.   Orders Authorizing the Initial GPS Tracking and the Renewed GPS Tracking
           of the Cellular Telephone Assigned Call Number 443-943-5127. ............... 10

    D.   Search and Seizure Warrant for 103 W. Conway Street, Baltimore City,
           Maryland on November 15, 2018 and subsequent arrest of Patrick Berlin,
           Gary Horton, and Pete Spyropoulos. ........................................................... 11

ARGUMENT ........................................................................................................... 15

    I.   The Defendants' Communications Were Lawfully Intercepted. ................... 15

          A.   The Affidavits in Support of the Intercept Requests
               Established Probable Cause. ........................................................... 17

          B.   The Affidavits Sufficiently Set Forth That Investigative
               Techniques Had Been Exhausted.................................................... 27

          C.   The Defendant Has Not Demonstrated the Need for a Franks Hearing,
               Nor Has He Demonstrated that the Circuit Court Judge Failed To Act
               as a Neutral and Detached Magistrate. .......................................... 34

          D.   Judges Robinson's Orders Comply with Both State and Federal Law. .......... 41

          E.   Good Faith. ...................................................................................... 42

          F.   There Was No Failure to Cease Monitoring, as the Goals and
               Objectives Had Not Been Achieved. .............................................. 43

          G.   There Was No Violation of the Court's Minimization Requirements............ 44

    II.   The Orders Authorizing the Installation of Pen Register/Trap and Trace
           Devices for Telephone Number 443-943-5127 were Properly Issued and
           the Defendant's Request for Suppression Should be Denied. ...................... 50

III.   The Orders Authorizing Initial GPS Tracking and the Renewed GPS Tracking
of the Cellular Telephone Assigned Call Number 443-943-5127 were Properly
Issued and the Defendant's Request for Suppression Should be Denied. ..................... 55

IV.   Defendant's Motions to Suppress Tangible Evidence Should be Denied
Because the Evidence Was Lawfully Obtained Pursuant to a Search Warrant
that was Supported by Probable Cause. ......................................................................... 60

    A.   The Search Warrant for 103 W. Conway Street Was Supported
Probable Cause based Observations and Intercepted Communications
Establishing the Defendant's Ongoing Drug Trafficking Activities and
Firearms Possession. ..................................................................................... 61

    B.   Even if this Court Finds Probable Cause Did Not Exist for the Issuance
of a Specific Warrant, the Officers Relied in Good Faith on Warrants
Issued by a Judge of the Circuit Court for Baltimore County. ....................... 67

**CONCLUSION** ............................................................................................................... 69

**CERTIFICATE OF SERVICE** ............................................................................... 70

## INTRODUCTION

Now comes the United States of America by its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, Jeffrey Hann, Special Assistant United States Attorney, and Anatoly Smolkin, Assistant United States Attorney and responds in opposition to the Defendant Gary Horton's Pre-Trial Motions.  This consolidated response addresses the motions raised by the Defendant as reflected in ECF documents 111 through 115.

## PROCEDURAL SUMMARY OF THE CASE

On March 12, 2019, a federal grand jury returned a sixteen-count indictment in the above-captioned matter.  Count One charges that from in or about September, 2018, and continuing through in or about November, 2018, in the District of Maryland, Justin Akonom, Patrick Berlin, Jason Brooks, Eric Foss, Gary Horton, Antwan Lee, and Pete Spyropoulos conspired to distribute and possess with intent to distribute heroin, a Schedule I narcotic controlled substance; cocaine, a Schedule II narcotic controlled substance; and marijuana, a Schedule I narcotic controlled substance in violation of 21 U.S.C. § 846.  With respect to Defendant Gary Horton specifically, Count One further alleges that the amount of narcotics attributable to Gary Horton as part of the conspiracy was 500 grams or more of a mixture or substance containing a detectible amount of cocaine, a quantity of a mixture or substance containing a detectible amount of heroin, and a quantity of a mixture or substance containing a detectible amount of marijuana.

Count Three charges that on or about November 15, 2018, Patrick Berlin and Gary Horton did knowingly, intentionally and unlawfully possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine; a quantity of a mixture or substance containing a detectible amount of heroin, and a quantity of a mixture or substance containing a detectible amount of marijuana in violation of 21 U.S.C. § 841(a)(1).

Count Two charges that on or about November 15, 2018, Gary Horton did knowingly, intentionally and unlawfully possess three specified firearms in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, namely the charges described in Counts One and Three, in violation of 18 U.S.C. § 924(C)(1)(A).

Count Twelve charges that on or about November 15, 2018, Gary Horton did knowingly and unlawfully possess three specified firearms after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).

Finally with respect to Gary Horton, Court Fifteen charges that on or about November 15, 2018, Patrick Berlin and Gary Horton did knowingly, intentionally and unlawfully use and maintain the premises at 103 W. Conway Street, Baltimore City, Maryland for the purpose of manufacturing, storing, distributing and using heroin, cocaine, and marijuana, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2.

Defendant Gary Horton has filed pre-trial motions seeking suppression of evidence from wiretaps [ECF 113], evidence obtained by pen register or trap and trace devices [ECF 112], evidence obtained related to GPS and cellphone location data [ECF 115], and evidence obtained from the search and seizure warrant for 103 W. Conway Street executed on November 15, 2018 [ECF 111].

Defendant Eric Foss has already plead guilty and been sentenced in connection with this indictment. Plea negotiations continue with respect to the other Defendants in this case, and through counsel they have expressed interest in attempting to reach resolutions without proceeding with motions arguments. To the extent that other Defendants have filed motions in the case, the Government will respond separately or request to extend the arguments contained herein if the parties are unsuccessful in resolving their respective cases.

## STATEMENT OF FACTS

During fall of 2018, members of the Baltimore County Police Department, Homeland Security Investigations (HSI), and the Drug Enforcement Administration (DEA) were involved in an investigation into individuals suspected to be trafficking cocaine, heroin, marijuana, and other CDS in Baltimore County and Baltimore City.  The investigators developed several targets of the investigation, including Gary Horton and Jason Brooks.  In September 2018 Baltimore County State's Attorney Scott D. Shellenberger made application to Baltimore County Circuit Court Judge Dennis Robinson for authorization to intercept wire and electronics communications of cellular telephones associated with Gary Horton and Brooks, designated as lines A through D.   In particular, Line-A was phone number (410) 805-8573 used by Jason Brooks,  Line-B was  (410) 900-7478 used by Jason Brooks, Line-C was phone number (443) 943-5127 used by Gary Horton, and Line-D was (410) 622-8907 also believed to be used by Gary Horton.  During the course the investigation the investigators identified a series of additional relevant phone lines for these targets, and also developed probable cause to intercept other co-conspirators in communication with Horton, including Defendant Albert Linton (who is charged separately in a drug conspiracy under case number ELH-19-0116).

### A.   Title III Interception of Wire and Electronic Communications of Defendant Gary Horton.

On September 21, 2018, Baltimore County State's Attorney Scott D. Shellenberger made application to Baltimore County Circuit Court Judge Dennis Robinson for authorization to intercept wire and electronics communications for a cellular telephone, 443-943-5127, (hereinafter "C-Line") as well as subsequent telephone numbers Gary Charles Horton, the user of C-Line.

Exhibit 1 – Application for interception of C-Line.[1]  On the same date Baltimore County State's Attorney Scott D. Shellenberger also made application to Baltimore County Circuit Court Judge Dennis Robinson for authorization to intercept wire and electronics communications for a cellular telephone, 410-622-8907, (hereinafter "D-Line").   These applications were supported by an affidavit sworn to by two experienced narcotics detectives, which also supported requested authorization to intercept A-Line and B-Line of Jason Brooks.  *See* Exhibit 2 – Affidavit in support of interception of lines A, B, C, and D; and Exhibit 3 – Exhaustion statement.  Based on the application and affidavit, Judge Robinson authorized the interception of wire and electronic communications on C-Line and on D-Line, as well as subsequent telephone numbers for Gary Charles Horton.  Exhibit 4 and Exhibit 5 – Orders for the interception of lines C and D.  Court Authorized interception began on these lines associated with Gary Charles Horton, and Horton's voice was intercepted.  The particular investigative steps and observations described in these affidavits and those summarized below will be discussed in more detail in the relevant argument sections that follow.

On October 3, 2018 the affiant detectives submitted a report of investigation to Baltimore County Circuit Court Judge Dennis Robinson explaining further investigations indicating that Defendant Gary Horton and Jason Brooks had apparently switched the phone numbers they used to contact one another.  Based on their investigation they believed that Gary Horton was using an additional cellular telephone number (443) 686-0698 (hereinafter "F-Line") based on common toll record contacts, the same subscriber name as C-Line (but a different address), and the pattern of toll contacts lines C, D and F with Brooks on A-Line.  Exhibit 6 – Report of investigation as to

---

[1] All exhibits have been supplied to the Defendant as part of discovery.  The Government will be providing copies of the exhibits referred to herein to the Court as part of the courtesy copy of its response which will be submitted to the Court.

lines E and F.  They further determined that Jason Brooks was now using cellular telephone number (443) 734-6101 (hereinafter "E-Line").  *Id.*  Based on the earlier application by the State's Attorney related to Lines A, B, C, and D, and the report of investigation, on October 3, 2018 Judge Robinson authorized the interception of wire and electronic communications on F-Line used by Gary Horton and on E-Line used by Jason Brooks.  Exhibit 7 – Order authorizing interception of F-Line.  However, when interception began on Line-F, the investigators quickly determined that Gary Horton was not in fact the individual using the phone and terminated their interceptions.  As a result, the Defendant's voice was not intercepted on F-Line.  Interception of Jason Brooks on Line-E was successful, and was continued.

On October 9, 2018 the affiant detectives submitted a report of investigation to Baltimore County Circuit Court Judge Dennis Robinson explaining further investigations indicating that Defendant Gary Horton was using a cellular telephone bearing number (443) 734-5075 (hereinafter "I-Line").  Exhibit 12 – Report of investigation as to I-Line.   Based on the earlier application by the State's Attorney related to Lines C and D, and the report of investigation, on October 11, 2018 Judge Robinson authorized the interception of wire and electronic communications on I-Line of Gary Horton.  Exhibit 13 – Order authorizing interception of I-Line. As a result of the court-authorized wiretap over I-Line, law enforcement officers intercepted further communications of the Defendant.

On October 10, 2018, Baltimore County State's Attorney Scott D. Shellenberger made application to Baltimore County Circuit Court Judge Dennis Robinson for authorization to intercept wire and electronics communications for a cellular telephone, 336-497-8538, (hereinafter "G-Line") as well as subsequent telephone numbers for Albert Jason Linton.  Exhibit 8 - Application for interception of G-Line.  On the same date Baltimore County State's Attorney Scott

D. Shellenberger also made application to Baltimore County Circuit Court Judge Dennis Robinson for authorization to intercept wire and electronics communications for a cellular telephone, 410-925-4480, (hereinafter "H-Line"). These applications were supported by an affidavit sworn to by two experienced narcotics detectives. *See* Exhibit 9 – Affidavit in support of interception of lines G and H; and Exhibit 10 – Exhaustion statement. Based on the application and affidavit, Judge Robinson authorized the interception of wire and electronic communications on G-Line and on H-Line, as well as subsequent telephone numbers for Albert Jason Linton. Exhibit 11 – Order authorizing interception of G-Line. As a result of the court-authorized wiretap over G-Line, law enforcement officers intercepted communications of Albert Linton, who was in communication with Gary Horton.

On October 22, 2018, Baltimore County State's Attorney Scott D. Shellenberger made application to Baltimore County Circuit Court Judge Dennis Robinson to extend the authorization to intercept wire and electronics communications for C-Line as well as subsequent telephone numbers Gary Charles Horton. Exhibit 14 – Second Application for interception of C-Line. This application was again supported by an affidavit sworn to by two experienced narcotics detectives. See Exhibit 15 – Affidavit in support of interception of lines A, B, C, E, and I; and Exhibit 18 – Second exhaustion statement. Based on the application and affidavit, Judge Robinson authorized the interception of wire and electronic communications on C-Line and I-Line, as well as subsequent telephone numbers for Gary Charles Horton. Exhibits 17 and 18 – Orders authorizing lines C and I respectively. Judge Robinson also authorized the continued interception of Brooks' A-Line, B-Line, and E-Line on the same date. Of note, the investigators did not seek continued authorization to intercept D-Line, as they had not discovered significant evidence of that line being used to further the drug trafficking conspiracy using that particular phone and had terminated their

interceptions of it on or about October 14, 2018.  See Exhibit 27 at 6 – Court Report for period of 10/8/2018 to 10/14/2018.

On October 26, 2018 the affiant detectives submitted a report of investigation to Baltimore County Circuit Court Judge Dennis Robinson explaining further investigations indicating that Defendant Gary Horton was using an additional cellular telephone bearing number 424-303-8984 (hereinafter "L-Line") based on intercepted communications on C-line with an individual named Savanna Weber in which she was texting Horton on a phone she calls "California" apparently separate from C-Line.  Exhibit 19 at 2 – Report of investigation as to L-Line.  Subpoenaed toll records then allowed them to identify a California based phone number contacted by Weber, and in turn to confirm that that phone had common contacts with C-Line including Horton's roommate and girlfriend.  *Id.* at 4.  Based on the earlier application State's Attorney and the report of investigation, on October 26, 2018 Judge Robinson authorized the interception of wire and electronic communications on L-Line of Gary Charles Horton. Exhibit 20 – Order authorizing interception of L-Line.

On November 7, 2018, Baltimore County State's Attorney Scott D. Shellenberger made application to Baltimore County Circuit Court Judge Dennis Robinson for authorization to continue to intercept wire and electronics communications for G-Line (335-497-8538), H-Line (410-925-4480), and K-Line (904-894-5576), as well as subsequent telephone numbers for Albert Jason Linton.  *See* Exhibit 21 – Second application of interception of G-Line.  These applications were supported by an affidavit sworn to by two experienced narcotics detectives.  *See* Exhibit 22 – Affidavit in support of interception of Lines G, H, and K; and Exhibit 23 – Exhaustion statement. Based on the application and affidavit, Judge Robinson authorized the interception of wire and electronic communications on G-Line, H-Line, and K-Line, as well as subsequent telephone

numbers for Albert Jason Linton.  *See* Exhibits 24 – Order interception of G-Line.  As before, communications of Gary Horton were intercepted during communications with Linton on G-Line.

Shortly thereafter, the investigators prepared a coordinated take down involving search warrant executions and the issuance of indictments and arrest warrants with the assistance of the Baltimore County State's Attorney's Office.  Several co-conspirators were taken into custody during the execution of search warrants and arrest warrants, including the warrant executed at 103 W. Conway Street on November 15, 2018, and interception of all lines ended thereafter.  Orders sealing the digital recordings of each line were issued by the Court on November 16, 2018.

> **B.    Orders Authorizing the Installation of Pen Register/Trap and Trace Devices for Telephone Number 443-943-5127.**

On July 17, 2018, Detective Trageser of the Baltimore County Police Department submitted an Application for the Installation and Use of a Pen Register/Dialed Number Recorder and Caller Identification/Caller Identification Deluxe Features (the "July 17, 2018 Pen Register Application" or the "July Application").  *See* ECF No. 111-2.  The July Application was directed at telephone number 443-943-5127 with service provided by T-Mobile.  The July Application listed the name "John Jones" as the individual to whom the telephone number was subscribed, along with the billing address associated with the account.  *Id.* at 4.

The July Application also described in detail Detective Trageser's investigation to date into the drug trafficking activities of the user of telephone number 443-943-5127.  ECF No. 111-2 at 4-8.  As of the date of the July Application, investigators did not know that Defendant Gary Horton was the individual utilizing 443-943-5127.  The Application specifically stated that "Detective Trageser has exhausted all known investigative measures attempting to identify the subject utilizing phone number 443-943-5127 with negative results."  ECF No. 111-2 at 8.  The July Application included a statement from Detective Trageser, under oath, that the information likely

to be obtained was relevant to an ongoing criminal investigation conducted by the Baltimore County Police Department. *Id.* at 9.

On July 17, 2018, the Circuit Court for Baltimore County entered an Order authorizing the installation of a pen register/trap and trace device on 443-943-5127, as requested in the July Application (the "July 17, 2018 Pen Register Order" or the "July Pen Register Order").

Two months later, on September 18, 2018, Detective Trageser submitted a subsequent pen register/trap and trace application (the "September 18, 2018 Pen Register Application" or the "September Application"). *See* ECF No. 111-3. Like the July Application, the September Application was directed at telephone number 443-943-5127 with service provided by T-Mobile. The September Application also included the name "John Jones" as the individual to whom the telephone number was subscribed, along with the billing address associated with the account. *Id.* at 9. Once again, the September Application described in detail Detective Trageser's investigation to date into the drug trafficking activities of the user of telephone number 443-943-5127. *Id.* at 1-8. This time, however, Detective Trageser was able to identify Defendant Gary Horton as the likely individual utilizing 443-943-5127. *Id.* at 6. Finally, the September Application included a statement from Detective Trageser, under oath, that the information likely to be obtained was relevant to an ongoing criminal investigation conducted by the Baltimore County Police Department. *Id.* at 9.

On September 18, 2018, the Circuit Court for Baltimore County entered an Order authorizing the installation of a pen register/trap and trace device on 443-943-5127, as requested in the September Application (the "September 18, 2018 Pen Register Order" or the "September Pen Register Order").

**C.      Orders Authorizing the Initial GPS Tracking and the Renewed GPS Tracking of the Cellular Telephone Assigned Call Number 443-943-5127.**

Defendant Horton has moved to suppress three orders authorizing the disclosure of real-time or present location information for the cellular telephone assigned call number 443-943-5127. *See* ECF Nos. 115, 120.  On May 10, 2018, Detective Trageser of the Baltimore County Police Department submitted an Application for an Order Authorizing Obtaining and Disclosure of Real Time or Present Location Information without Geographic Limitations to Include Disclosure of Telecommunication Records for the Electronic Device with the Number 443-943-5127 (the "May Cell Phone Tracking Application").  *See* ECF No. 120-1.  The Application included an Affidavit in Support, which set forth a statement of probable cause to believe that the user of telephone 443-943-5127 was committing a crime and that location information for 443-943-5127 would constitute evidence of, or would lead to evidence of, the crime being investigated.  *Id.* at 3-6.  The affidavit described a drug trafficking investigation into an individual named Antwon Hall, as well as the identification of phone number 443-943-5127 as a number with numerous contacts with Hall.  *Id.* at 4.  The affidavit also described a high volume of contacts between the user of 443-943-5127 and other subjects who were under investigation for narcotics trafficking.  *Id.* at 5.  Detective Trageser also certified that, as of the date of the Application, he was not aware of the identity of the subject using phone number 443-943-5127.  *Id.* at 5.

On May 10, 2018, the Circuit Court for Baltimore County entered an order authorizing the GPS tracking of the cellular telephone assigned call number 443-943-5127, finding probable cause to believe that the location information of 443-943-5127 would constitute evidence of the crime being investigated.  *Id.* at 7-10.

On July 17, 2018, Detective Trageser submitted an Application for a second order authorizing the GPS tracking of the cellular telephone assigned call number 443-943-5127.  ECF

No. 115-2.  Once again, the Application included a statement of probable cause.  *Id.* at 3-9.  In particular, the affidavit described a drug trafficking investigation into an individual named Antwon Hall, as well as the identification of phone number 443-943-5127 as a number with numerous contacts with Hall.  *Id.* at 4.  The affidavit then described the contacts between the user of 443-943-5127 and other subjects who were under investigation for narcotics trafficking.  The affidavit also summarized information provided to law enforcement by a confidential source concerning narcotics trafficking by individuals communicating with the user of 443-943-5127.  *Id.* at 5. Finally, the affidavit quoted from text messages obtained by law enforcement pursuant to a text message search warrant for 443-943-5127, which Detective Trageser believe were drug related, based on his training and experience.  *Id.* at 7-9.  Detective Trageser also certified that, as of the date of the Application, he was not aware of the identity of the subject using phone number 443-943-5127.  *Id.* at 9.

On July 17, 2018, the Circuit Court for Baltimore County entered an order authorizing the GPS tracking of the cellular telephone assigned call number 443-943-5127, finding probable cause to believe that the location information of 443-943-5127 would constitute evidence of the crime being investigated.  *Id.* at 10-13.  On August 16, 2018, the Circuit Court for Baltimore County entered an order authorizing the GPS tracking of the cellular telephone assigned call number 443-943-5127, once again finding probable cause to believe that the location information of 443-943-5127 would constitute evidence of the crime being investigated.  ECF No. 120-2 at 3-6.

**D.      Search and Seizure Warrant for 103 W. Conway Street, Baltimore City, Maryland on November 15, 2018 and subsequent arrest of Patrick Berlin, Gary Horton, and Pete Spyropoulos.**

Defendant Horton also seeks to suppress evidence seized from 103 W. Conway Street pursuant to a warrant executed as part of the "take-down" of this wiretap investigation on

November 15, 2018.    Prior to the November 15, 2018 take-down, Baltimore County Police Department Detectives Scott Kilpatrick, Chad Trageser, and Homeland Security Investigations ("HSI") Task Force Officer ("TFO") E. Moore presented an Application for a Search and Seizure Warrant to the Honorable Dennis Robinson of the Circuit Court for Baltimore County related to the residence of Gary Horton and Patrick Berlin.  Exhibit 26 – Application, Affidavit, Warrant, and Motion to Seal.  The Application sought judicial authorization to search the premises known as 103 W. Conway Street, Baltimore, Maryland, 21201 as well as the person of Gary Charles Horton.  *See Id.* at 1 and 21.  The affiants further sought "no-knock" authorization to enter without knocking and announcing based on intercepted communications during course of the wiretap indicating that Horton has access to firearms and that he had purchased a handgun during the course of the investigation.

In support of their search warrant application, co-affiants Detective Kilpatrick, Detective Trageser, and TFO Moore submitted an affidavit describing portions of their investigation into the narcotics trafficking activities of Defendant Gary Horton and other subjects of the investigation. The affidavit began by briefly describing the court-authorized wiretap of Gary Horton's cellular telephones beginning on September 24, 2018, and in particular Gary Horton's C-Line (443-943-5127).  The affiants explained that they identified Albert Jason Linton as a source of supply for Horton, and summarized relevant text messages intercepted as part of the investigation.  *Id.* at 4. The affiants relayed that the two arranged to meet in a manner that was consistent with Narcotics trafficking, and that Horton gave the address "138 west barre st" via text message to Linton as the meeting location, which they knew to be near his 103 W. Conway residence.  *Id.*  The affiants then relay a conversation between Horton and a subject named "Steven McGeeney" on the following day, September 29, 2019.  *Id.* at 5.  In the first portion of this call McGeeney tells Horton "I got

one dude in Essex, yo he's like my best dude right, he keeps begging me to get something better yo, he said he will pay whatever yo, I really need something better to just give me a little push yo." and Horton responds "I can't really help you out yo, I can give you a little better number." McGeeney then asks "It's the exact same?" and Horton responds "No this shit a little better yo, they said it's got a good smell and taste". *Id.* After summarizing this exchange, the affiants go on to report that the next section of the call was "minimized" for several seconds, but was spot checked for further relevant conversation. In the second portion of the same call Horton and McGeeney discuss a "Taurus," known to be a make of firearm, and ammunition and accessories that McGeeney is trying to sell, stating "I'm saying I've got two boxes of full metal jacket hollow tips plus a thirty round joint that comes with it". *Id.* The affiants believe based on the call that Horton was agreeing to facilitate the sale to a 3rd party, and he responds to McGeeney during the call "he said he will take it for that if you are going to give him the accessories." Based on these two segments of the call, and based on their experience, the affiants believed that the first portion of the call referring to "good smell and taste" was a communication about the quality of controlled substances, and that the later section was an agreement for Horton to buy a Taurus handgun from McGeeney on behalf of some third party.

The affiants went on to summarize a series of intercepted communications between Albert Linton and Gary Horton which were consistent with drug trafficking and which involved meetings at Horton's Conway street residence. For example, on September 30th, 2018 the investigators intercepted a call in which Linton stated he wanted to meet at Horton's residence after giving a status report about what the investigators believed to be narcotics trafficking. Investigators surveilled the address and watched as Linton arrived at 103 W. Conway Street, went inside for a brief time, then returned to his vehicle to retrieve a black backpack and bring it inside. Horton and

Linton were then seen walking out of the residence together and shaking hands.  *Id* at 6-7.  A similar call occurred on October 1, 2018, and again investigators observed Linton arrive at the Conway street address and walk towards Horton's residence with a dark colored backpack as before.  *Id.* at 8.

On November 2, 2018 investigators intercepted another communication between Linton and Horton in which Linton states "Need U til get the crew together maybe only 1 I think and she on 37th street."  *Id.* at 9.  Based on the affiants training and experience and the context of this conversation, they believed this text message referred to Linton preparing to sell 1 kilogram of cocaine to Horton.  On the following date Linton asked Horton "U got it together" and Horton responded "yeah" and again the two arranged to meet. *Id.* As before, detectives conducting surveillance watched Linton arrive Horton's Conway street residence, bringing the black backpack they had seen previously.

Based on the information summarized above—as well as the additional information contained in the search warrant affidavit—Judge Robinson signed the Search and Seizure Warrant on November 9, 2018.  On November 15, 2018, law enforcement officers executed the search and seizure warrant at 103 W. Conway Street, using force to enter.  Gary Horton was not present in the residence at that time, but the executing officers located Patrick Berlin hiding in the rear left bedroom closet.  The officers located a variety of narcotics in their search of the bedrooms and common areas of the residence.  In particular they recovered several bags of suspected cocaine, suspected ecstasy, suspected marijuana, and pills of suspected Xanax in the kitchen, as well as 3 digital scales and a money counter.  In the bathroom they recovered 8 knotted bags of suspected cocaine, and 2 knotted bags of suspected ecstasy.  In Berlin's left bedroom they recovered vials of suspected HGH, several cellphones, a bag of green pills, and approximately $5,000, among other

items.  Finally in right rear bedroom they recovered several bags of suspected cocaine, bottles of narcotics cutting agents, large bags of marijuana, a kilogram press, and several iphones, and documents indicating the bedroom belonged to Gary Horton.

Firearms and ammunition were also found hidden or stored throughout the apartment.  The investigators recovered 1. A loaded .357 caliber Smith and Wesson revolver in a kitchen drawer; 2. A loaded Taurus 9mm handgun (in the armrest of a couch), boxes of 9mm ammunition, a loaded 9mm extended magazine, and loose .40 caliber ammunition in the living room; 3.  A Bushmaster AR-15 223 caliber rifle in the hallway closet, along with a 9mm firearm barrel; 4.  A Glock 43 9mm handgun with an empty magazine, and a loaded Glock 23 .40 caliber handgun were both found in the right rear bedroom associated with Horton.

Patrick Berlin was arrested and subsequently charged at the time of the search warrant execution.  During this time investigators had determined that defendants Gary Horton and Pete Spyropoulos were travelling together out of state, on what investigators believe was a drug related trip to California.  A warrant for the arrest of each had been secured on November 9, 2020 by the Baltimore County State's Attorney's office based on their indictment of both in connection with the drug trafficking conspiracy.  They were ultimately located by State troopers in Illinois on November 15, 2018 and taken into custody.

## **ARGUMENT**

### I.    **The Defendants' Communications Were Lawfully Intercepted.**

Defendant Gary Horton has filed a motion to suppress the contents of calls intercepted pursuant to Court authorized wiretaps on lines A, B, C and D, as well as any extensions or additional subsequent wiretaps stemming from those.  With respect to Horton, additional lines at issue include Lines I and L which were directly used by Horton, as well as lines used by

coconspirators Jason Brooks and Albert Linton who communicated with Horton.  In his motion to suppress these wiretaps, Horton argues that (1) that there was no probable cause to obtain the orders from Baltimore County Judge Dennis Robinson; (2) that the affiants lacked appropriate police jurisdiction to investigate the Defendant; (3) the investigators failed to exhaust alternative investigative techniques, prior to seeking the wiretap orders; (4) that the Defendant is entitled to a Franks hearing based on alleged intentional false statements by the affiants; (5) that Judge Robinson failed to act as a neutral and detached magistrate; (6) that the investigators failed to make progress reports to the Court as required.  The Defendant also asserts that the affidavit for Lines A through D provided to him as part of discovery is not the same as that provided to Judge Robinson, but this argument has no basis in reality.[2]

In analyzing the Defendant's motion, two important principles should be noted at the outset.  First, the burden is on the Defendant to show illegality.  *United States v. Matlock*, 415 U.S. 164, 177 (1974); *see also* Fishman and McKenna, *Wiretapping and Eavesdropping*, §23.5 (rule that party seeking suppression of evidence has burden of proof by preponderance that evidence was illegally seized should govern motion to suppress eavesdropping evidence).  The second principle is that the "determinations by an issuing judge(s) are accorded substantial deference"

---

[2] The argument that the affidavit received in discovery is not the true affidavit reviewed by the Judge is apparently entirely speculative, based on the physical appearance of the pdf document. The Government provided the Defendants with copies of the wiretap documents using PDF scans created by the Detectives were available, but in the case of the first affidavit it was directly converted to PDF from a word document – resulting in a clearer pdf image without the artifacts of the scanning process.  In preparation for this response motion the Government has obtained a scanned version from the Detectives' preserved wire binder and provided that to Defense and as Exhibit 2 here.  There is no difference in content between this scan and the PDF originally provided in discovery.  The Government is also seeking a complete copy of the wire binder from Judge Robinson's chambers or the Baltimore County Office of the States attorney in case that is necessary to lay to rest this speculation, but as of the time of this writing the officer has been unable to retrieve it due to Court and office closures during this pandemic period.

when reviewing wiretap orders. *United States v. McKinney*, 785 F. Supp. 1214 (D. Md. 1992).  In

*McKinney*, Chief Judge Black further explained:

> The function of this Court, which is essentially reviewing the previous findings of [the issuing judge], is "not to make de novo determinations of sufficiency as if it were [an issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made. *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir. 1977).

*Id.* at 1220.

### A.    The Affidavits in Support of the Intercept Requests Established Probable Cause.

Section 10-408 of Maryland's Courts and Judicial Proceedings Article outlines the

procedural requirements and the factual determinations that must be made for a lawful wiretap

order to issue.  Among other requirements, before issuing an order allowing the interception of

wire or electronic communication, Judges of the Circuit Court for the State of Maryland are

required to determine whether on the basis of the facts submitted by the applicant:

- there is probable cause for belief that an individual is committing, has committed or is about to commit a particular offense enumerated in §10-406 of this subtitle;

- there is probable cause for belief that particular communications concerning that offense will be obtained through the interception of communications over the targeted communication device; [and]

- there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense...

Md. Code, Cts. & Jud. Proc. §10-408 (c).

The standard of review governing affidavits in support of wiretap orders is identical to the

standard governing the review of search warrants; for a wiretap order is a specialized sort of search

warrant.  *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983).

It is axiomatic that such affidavits "must be tested and interpreted by magistrates in a common sense and realistic fashion ... Technical elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject of surveillance would be obtained." *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988). When an issuing judge makes a finding of probable cause, a reviewing court should not review that decision in a "hypertechnical, rather than common sense manner." *Ventresca*, 380 U.S. at 109. A reviewing court is not to substitute its judgment as to probable cause, but only need determine whether there was a substantial basis for the issuing court's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

In his challenge to the probable cause laid out in the initial wire affidavit, Defendant Horton ignores the totality of the affidavit and instead disputes a scattered assortment of conclusions and interpretations reached by the officers during the investigation. His motion misses the forest for the trees – the affidavit lays out a step by step narrative which in its totality demonstrates the bases on which Judge Robinson properly found probable cause to believe that Gary Horton was participating in drug trafficking and a drug trafficking conspiracy, using the targeted cellphones, and that communications on those phones would provide evidence of those crimes.

Investigators first sought to intercept Gary Horton's C-line on September 21st, simultaneously with requested authorizations to intercept lines A, B, and D. *See* Exhibit 2 – the Affidavit related to Lines A, B, C and D. In their initial affidavit the investigators first identify Gary Horton and his relevant criminal history, and how they learned of his suspected involvement in drug trafficking. They move step by step through first linking the phone to known drug

18

traffickers, then to their process to identify Gary Horton as the user of that phone.  As discussed in more detail below, C-Line (443-943-5127) was a so-called "top caller" in the toll records of Jason Brooks, who had been identified during an earlier cocaine trafficking wiretap investigation, and is also described in detail in the affidavit.

The investigators relayed how they first became aware of C-Line, telephone number 443-943-5127, as part of an earlier drug trafficking investigation by the detectives with the Baltimore County Police Department.  Exhibit 2 at 11.  At that time in February 2018 the detectives were investigating a subject named Antwon Alexander Hall, who was involved in suspected heroin and cocaine trafficking and had been observed conducting suspected sales of narcotics to several individuals who were also known to Baltimore County police.  Exhibit 2 at 11-19.  This section of the affidavit lays out in detail their investigative history with Anton Hall, which Defendant Horton asserts is improperly included and without connection to Horton.  ECF 113 at 7.  To the contrary, this detailed information provides a factual basis for Judge Robinson to determine that Anton Hall is an individual actively engaged in drug trafficking, and they then proceed to clearly explain how Gary Horton's C-Line is directly linked to Hall.  These building blocks are precisely how probable cause is developed.

As part of that investigation they obtained cellphone toll records for Hall and observed that he had 252 contacts with C-Line, later identified as Gary Horton's phone line, in the span of only about 45 days between Jan 1, 2018 and February 15, 2018.  Exhibit 2 at 19.  During this time the investigators were also reviewing toll records for subject Jason Brooks (user of lines A and B), and saw that he was also in communication with C-Line.  Exhibit 2 at 19.  In May of 2018 detectives obtained authorization to track the location of C-Line and observed that between May

15 and May 25 it was in California, a known source state for narcotics entering the US.  Exhibit 2 at 20-21.

Detectives also obtained a search warrant to retrieve historical text communications of communications of Antwon Hall during June 17, 2018 to June 22, 2018 related to suspected narcotics distribution activity at that time.  Exhibit 2 at 22.  Specifically, the affiants lay out in the wire affidavit various text messages that are consistent with individuals asking Hall if he has drugs to sell such as "Lil cuz you got any joints" and "A yo if you not straight just give me da money back I need to grab up."  Exhibit 2 at 23.  The affiants then cite a conversation the following day with Horton's C-Line where the two appear to coordinate a meeting in the area of Cedonia Avenue, and note that the cell site information for Hall's phone bears out the fact that Hall was in that area at the time of the text messages with C-Line.  Exhibit 2 at 25.  The affiants state their reasonable inference for the Judge that the conversation between Hall and C-Line "is consistent with individuals arranging to meet for a narcotics transaction" and that this is corroboration for their belief that the user of C-Line is the source of supply for Hall.  *Id.*  Defendant Horton challenges this particular interpretation however, by offering his own interpretation of a later text message Hall sends after this meeting stating "Yo said first thing," to an unidentified individual, which Horton asserts proves Hall didn't actually receive drugs from the user of C-Line.  ECF 113 at 7.  The cited message was included in a transcribed text message included in a later pen register application presented during the course of investigation.   It's difficult to know based on the text messages alone whether Horton's interpretation is factually correct, but it does not in any way negate the probable cause.  The later text message would be consistent with Horton and Hall meeting and discussing a drug delivery that would take place the following day, or with more time being needed for packaging or processing of drugs.  Even if the officers were mistaken about the

meeting's purpose, the pattern is nevertheless indicative of a drug trafficking meeting regardless of which party is acting as the "source" or when the delivery was completed.  The communications cited in the affidavit show that Hall is actively communicating with suspected drug customers, that he's agreeing to meet the user of C-Line in person in that same span of time, and within hours of texts to customers indicating he is expecting more supply.  Exhibit 2 at 23-24.  More importantly it demonstrates one of many reasons to believe that C-Line is being used to communicate about and facilitate drug trafficking and that interception of communications could offer evidence of exactly what is being said during meetings like this one.  In his motion, the Defendant asserts that he could not possibly be Hall's source of supply if the pattern of Hall meeting Horton didn't instantly result in saleable drugs ready for customers.  The hierarchy need not be so crystalized, and drug trafficking faces supply interruptions like any other business.  It is entirely possible that Horton and Hall worked together to cultivate various sources of supply, or supplied each other with alternate drugs, or even that Horton intended to buy drugs from Hall rather than the other way around.   Each of these possible interpretations would support the probable cause.  The affiants addressed this and took care to explore Hall's activities to try to determine this relationship, and in July of 2018 they note that he too traveled to California as Horton had done in May.  These facts and interpretations were presented fully to the Judge so that he could make an informed determination of the probable cause.

Independent of the information related to Hall, the affidavit for C-Line relates in detail their investigation into subject Jason Brooks (user of A-Line and B-Line) and his connections with drug trafficking.  *See* Exhibit 2 at 27-36.   In particular the investigators noted numerous communications between Jason Brooks and Gary Horton, the user of C-Line.  Brooks and Horton also shared other contacts who were known to the investigators as involved in drug trafficking.

Exhibit 2 at 36.   A notable example is Defendant Pete Spyropoulos, who was identified as a frequent caller with Horton's C-Line, with a total of 101 calls between January 1, 2018 and March 23, 2018.   The affiants relay information about a connection between Pete Spyropoulos and an intercepted shipment of kilograms of Cocaine found in May 2018 hidden in a F150 truck, which was registered in the name of Spyropoulos' mother.   Exhibit 2 at 27.   They recount information gained from a confidential informant that an individual named "Pete" is involved in renting out "trap" vehicles with hidden compartments, like that truck, and information from the informant that Jason Brooks and his business partner were recipients of regular shipments of kilogram quantities of Cocaine.   Exhibit 2 at 32.   Defendant Horton asserts in his motion essentially that all of this information is only relevant to Jason Brooks, but each of these common links demonstrate that Gary Horton and Jason Brooks are linked directly and through co-conspirators and that interception of the communications of both Brooks AND Horton will provide evidence of the ongoing drug trafficking conspiracy and trafficking that they are both engaged in.

Throughout his motion, Defendant Horton challenges this kind of information obtained from confidential sources by claiming that the investigators failed to provide sufficient information about the reliability of the sources.   These arguments miss the point that corroborative detail contributes to the totality of information to provide probable cause, ignores the other valid concerns of law enforcement to maintain the secrecy of these sources.   In each instance the officers affirm in the sworn affidavit that the sources were known to be reliable, while simultaneously being careful to avoid specific details which could be used to identify those sources and potentially endanger them.   For the same reason they do not give specific dates, but rather use phrases like "During the month of March" to prevent a source's identity from being narrowed down using the specific date of a call or event.   *See e.g.* Exhibit 2 at 9.   They also present the details where possible

to link source information with actual law enforcement investigative steps which corroborate it, or note where they are unable to.  An example of this is in the section describing information about Defendant Jason Brooks and a subject identified as James Lohman, where the investigators detail information from an anonymous caller or callers, at least one of whom expressed a fear of retaliation.  Exhibit 2 at 7-9.  The investigators note details they were able to confirm, such the type of vehicle Brooks owns or the toll record support that a connection existed between Lohman and Brooks, but also note when they were unable to find any police reports for example of a reported theft of millions of dollars.  Exhibit 2 at 8.  While this leaves room to doubt the strength of the confidential source information, it provided the Judge with sufficient information to evaluate and determine to what degree it does or does not support the probable cause.  Each of these individual pieces could even be set aside, and still the affidavit provides ample other bases to conclude that Horton and Brooks are associated with each other and engaged in narcotics crimes using their respective phone lines.

Ultimately investigators were able to identify Horton as the user of C-Line by using a combination of Court authorized location tracking and in-person surveillance.  Exhibit 2 at 38-49. The investigators also observed Horton engaged in meetings consistent with drug trafficking with several individuals.  Exhibit 2 at 45-48, and 61-66.  Toll record analysis also showed numerous contacts between Horton's C-Line and individuals suspected to be involved in drug trafficking mentioned including continued contacts with Jason Brooks, Anton Hall, Pete Spyropoulos, and several others.  Exhibit 2 at 90-95.  They also identified a second line, D-Line, as belonging to Horton based on contemporaneous cell location information, and noticed numerous toll contacts in common.  Exhibit 2 at 84-85.

In his motion, Defendant Horton disputes these efforts and asserts that there was not probable cause to believe he was the user of C-Line 443-943-5127, though he does assert that he has standing as person who was ultimately intercepted using that very line.  In making these arguments Horton is attempting to exploit the methods he used to conceal is identity as the user of this phone.  The investigators provide in their affidavit a full accounting of the fact that other names are linked to the phone – first the name "John Jones" with an address at 3209 Hudson Street, which the officers attempted to surveil and research via police databases with no results.  Exhibit 2 at 26.  Then later, they found that the C-Line number was associated with the name of Defendant Patrick Berlin, who is Horton's roommate and named lessee at their 103 W. Conway street address, and tracked that the phone was often at that address overnight.  Exhibit 2 at 38.  Likewise, Berlin's name is the registered owner of the car that Horton was seen operating during their surveillance.  As the affiants explain, this is consistent with a common tactic of drug traffickers to obscure their connection to facilities used in their crimes and prevent their identity from being revealed from vehicle tag checks and apartment lease agreements, and Defendant Horton continues to try to exploit this tactic even in his motions.

Of course, the affiants did not rest on this suspicion alone in the presentation of probable cause to show Horton was in fact the user of C-Line and D-Line.  Instead, they meticulously surveilled the movements of the C-Line using cell site location data and in person and camera surveillance.  Through these techniques they were able to narrow down that the phone appeared to travel to and from the 103 W. Conway Street address when Horton was also seen coming and going, but did not similarly follow Berlin's movements.  *See* Exhibit 2 at 40 and 44.  They similarly narrowed down that the phone traveled to locations where Horton was directly observed but where Robert Topi, another potential subject and holder of the phone, and Patrick Berlin were not

observed, such as the horseshoe casino on July 24.  Exhibit 2 at 45.  This particular surveillance incident was also notable because the investigators observed Horton using a cellphone inside the casino, but then leave to meet at his vehicle with a subject identified as Jermaine Mikell.  Mikell, also identified as having a drug trafficking criminal history, met with Horton carrying a black book-bag but enters Horton's passenger seat for a minute in the parking lot and leaves with a different plastic shopping bag – all consistent with a suspected narcotics transaction.  Exhibit 2 at 46.  In his motion Defendant Horton focuses on the detail that it appears Horton has two different phones – one he uses inside the casino that appears not to be C-Line, and another left plugged in in the car.  While this may illustrate that Horton wasn't using C-Line to communicate with Mikell at that moment, it does not at all detract from the probable cause that Horton is engaged in drug trafficking and that C-Line is one of *several* phones he apparently used for that purpose.  This serves to bolster the need for a wire interception to obtain the complete evidence of Horton's drug trafficking activity, not to weaken it.

There is also mention in the affidavit of a series of suspected aliases or nicknames associated with Gary Horton, and conflicting physical descriptions offered by some confidential sources.  For example, one CI notes that a person named "Hock" is a Hispanic male, while the police investigators identify Horton as a white male.  To be frank, trying to identify someone's ethnicity based on skin tone and hair color alone is entirely subjective and any reasonable investigator or reviewing magistrate can determine what weight if any to give these kind of classifications.  In any event, the affiants take care to lay out exactly why they believed that the person the CI calls "Hock" is consistent with Horton, including that other CIs use a name with a similar first syllable ("Haku") for Horton, or that a similar phonetic spelling appears in Antoine Hall's phone as a contact name for the C-Line phone number ("Hak").  Exhibit 2 at 50.  The

Defendant disputes this these similarities, but it's a semantic argument.  The Judge was free to rely on the investigator's logic as one small piece of the overall probable cause, but even discounting the nickname would not negate the totality of probable cause in any way.

Perhaps the most significant event supporting the probable cause was a surveillance operation on July 29th and July 30th involving Gary Horton, Pete Spyropolous, Robert Topi, Jason Brooks and several others.  During the course of the investigation a camera was set up to observe 7611 Cypress Avenue, which was identified as a meeting place for various members of the conspiracy.  In reviewing footage in early August investigators watched a subject believed to be Christopher Dolle (a business partner of Jason Brooks in an auto-shop) arrive at that address. Exhibit 2 at 62.  Pete Spyropoulos (linked to Horton through toll records and to Brooks and Dolle through CI information) was also seen arriving at that address, as was Gary Horton.  Exhibit 2 at 63-64.  Finally, Horton and Spyropoulos are observed leaving together in a vehicle registered and known to be operated by Robert Topi.  During this time the investigators were still receiving GPS location data for Horton's C-Line phone and could see that at 11:54 at night the phone traveled to New York, a known source city for narcotics.  Exhibit 2 at 65-66.  It only remained there for span of hours, and at 2:30 am on July 30, 2018 the GPS data showed the phone coming back down I-95 from New York toward Maryland.  Exhibit 2 at 66.  In person surveillance at the Conway street address then confirms that Horton, Spyropolous, and Robert Topi all returned together at about 4:45 am.  Exhibit 2 at 66.  Importantly, during this same span of time investigators were monitoring the toll records of Jason Brooks which revealed a series of short calls between Horton and Brooks in the days leading up to this pilgrimage to New York – and the key detail that Horton called Brooks using C-Line at 12:09 am on July 30, 2020, apparently minutes after the GPS data showed the group arriving in New York.  This episode succinctly illustrates the entire group of suspected

coconspirators gathering together, making a trip consistent with obtaining a supply of narcotics from a source city, and using their cellular phones to facilitate it and remain in contact with one another.

All of this information provided Judge Robinson with ample support for his determination that there was probable cause to authorize the interception the communications of Horton's C-Line, as well as his D-Line which shared common coconspirator contacts. The collected weight of CI information, detailed comparisons of Toll records for Brooks and Horton, surveillance operations, and cell location analysis all provide a substantial basis to believe Gary Horton and his coconspirators were engaged in drug trafficking and were using these phone lines to facilitate that trafficking. Judge Robinson therefore had probable cause to issue his order authorizing continued interception of those lines. By the statutory gauge of §10-408(c), *viz.* that (i) the Defendants and others were committing, had committed, or were about to commit narcotics violations; (ii) that particular communications concerning narcotics violations would be obtained through the interception of communications over the targeted cell phones; and (iii) that cell phones were being used, or were about to be used, in connection with narcotics offenses, there was probable cause to issue the orders for the interception of communications over the targeted cellular telephones, and Judge Robinson did not err in issuing the instant wiretap orders.

### B.    *The Affidavits Sufficiently Set Forth That Investigative Techniques Had Been Exhausted.*

Both federal and state wiretap statutes contain identical provisions regarding exhaustion, *see* 18 U.S.C. § 2518(3)(c) and Md. Code, Cts. & Jud. Proc. § 10-408(a)(3). To satisfy the "exhaustion" or "necessity" requirements of the Maryland wiretap statute, each application for an order authorizing electronic surveillance must contain:

> A full and complete statement as to whether or not other investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or be too dangerous.

Md. Code, Cts. & Jud. Proc. § 10-408(a)(3).

Similarly, prior to granting an order authorizing a wiretap, the issuing judge must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Md. Code, Cts. & Jud. Proc. § 10-408(c).  This prerequisite to a wiretap order is commonly referred to as the "exhaustion" or "necessity" requirement.

As noted above, considerable deference is to be given to the issuing judges' determination that the wiretap applications provided sufficient information to satisfy the exhaustion requirement of Md. Code, Cts. & Jud. Proc. § 10-408(a)(3) and its federal analog, 18 U.S.C. § 2518(3) (c).  A district judge in reviewing the issuing judges' determination under Md. Code, Cts. & Jud. Proc. § 10-408(a)(3) and 18 U.S.C. § 2518(3) (c) is to apply a common sense approach to that review.

The "exhaustion" requirements were designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation, nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994); *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  The Fourth Circuit has held that while wiretaps are an extraordinary investigative tool, they are also necessary tools of law enforcement and that the "exhaustion" should not be read in an overly restrictive manner.  *United States v. Leavis*, 853 F.2d 215, 220 (4th Cir. 1988).  The Fourth Circuit has also repeatedly observed that:

> [T]he burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion'... that does not unduly hamper the investigative powers of law enforcement agents.

*Smith*, 31 F.3d at 1297 (quoting *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1997)).

The Government has never been required to show that other investigative methods have been wholly unsuccessful or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (emphasis in original); *Clerkley*, 556 F.2d at 222; *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989) (law enforcement official not required to exhaust all conceivable investigative procedures before seeking wiretap); *United States v. Bankston*, 182 F.3d 296, 306 (5th Cir. 1990) (exhaustion of every conceivable investigative option need not be shown); *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (wiretap necessary to learn full extent of drug operation despite attainment of degree of success with traditional investigative methods).

The exhaustion language is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153, n.12, (1974). "These procedures were not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974). At the same time the purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974). Nor need a wiretap be used only as a last resort. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975). Rather, Congress intended that the exhaustion showing be tested "in a practical and common sense fashion." S. Rep. No. 1097, 1968 U.S. Code Cong. & Ad. News, p. 2190.

Drug crime is necessarily harder to detect than other crimes because it is difficult to witness and does not create victims who are compelled to come forward and report the crime. *United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998). Courts have also held that, in assessing the need for

29

a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, the affiant's knowledge, training and experience as to whether a particular investigative technique will fail.  *See Smith*, 31 F.3d at 1299 (issuing court may take into account affirmations which are founded in part on experience of specially trained agents).  Furthermore, it is permissible for affiants to opine as to whether a particular procedure will succeed or fail. *Clerkley*, 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).

The Defendants' complaint that the agents investigating the drug conspiracy did not sufficiently exhaust alternative investigative techniques prior to seeking the wiretap orders is not supported by the facts.  The exhaustion portions of the affidavits (*See* Exhibits 3 and 16) detail at length the previous investigatory efforts that had been undertaken by law enforcement officers prior to making application for the wiretap orders at each stage of the ongoing investigation, as well as the progress towards the goals of the investigations.  The affidavits recite facts that support Judge Robinson's determination that electronic surveillance was necessary first to begin the interception of Gary Horton's and Jason Brooks communications, and then to intercept the phone lines used by Albert Linton and other co-conspirators, and to renew the interceptions at appropriate times.

Indeed, the affidavits detail that normal investigative procedures were either tried and failed, that they reasonably appeared unlikely to succeed, or if tried were too dangerous.  Even where investigative techniques such as visual surveillance and records checks were somewhat fruitful, they were not sufficient to identify all members of the drug trafficking conspiracy or to locate each of their drug stash locations.  As discussed in detail above, wire interception was by no means their first resort and considerable investigative efforts were needed to identify Gary Horton and the other coconspirators.  That work provided considerable evidence of the conspiracy,

but as the affidavit makes clear the actual content of communications was necessary to push the investigation further.

In his motion to suppress, Defendant Horton challenges several of the exhaustion section investigative techniques and in particular argues that the investigator's statements about efforts to investigate Jason Brooks are irrelevant to Gary Horton.  This ignores the evidence that the two men were in a drug trafficking conspiracy together, in frequent communication with one another per the toll records, and were each actively using methods to obscure their activities.  The investigators had every reason to believe that an exposure of their investigation as to one would affect the other.  Further, their descriptions of their efforts at investigative techniques did not express every conceivable anecdote, but rather they provided relevant episodes and examples for Judge Robinson.  This section of the affidavit should not be read in isolation - their descriptions of the work put in to surveil and identify Horton in the main body of the probable cause also illustrated their diligent efforts, and the challenges they faced.  Exhibit 3 at 2.

In his motion, Defendant Horton continuously asserts that the investigators failed to properly use methods such as controlled buys or confidential informants, while at the same time ignoring or discounting the information those cooperators DID provide, such as the identification of the person named "Hock" as drug trafficker that worked with Brooks.  Exhibit 2 at 50.  This is a perfect illustration of the challenges that the investigators were facing – they had various anonymous and known reliable sources providing valuable information, but those sources didn't apparently have the ability to directly communicate with individuals like Gary Horton even enough to know his full name or to point to his specific drug techniques.  In turn, without well positioned internal sources who are capable of making introductions, safely and effectively introducing a totally new person or undercover officer in order to offer a controlled drug sale to or from Horton

would have been nearly impossible.   Defendant Horton also asserts that tactics like GPS tracking devices placed on his vehicles or more dogged following of his car could have met the investigator's goals in the investigation.   This is ironic given his arguments elsewhere that the investigators lacked jurisdiction to even observe or review phone data to track him outside of Baltimore County.   More importantly, it ignores the dozens of pages of the affidavit which describe how they DID use tracking and surveillance effectively but could still not identify all the participants in meetings, or hear the conversations during those meetings, or see into the contents of bags being carried.   Horton also falsely asserts that the affidavit only shows him using one specific easily tracked vehicle when in reality he was operating one of several cars registered in someone else's name and frequently seen using or riding in the cars of other coconspirators, sometimes switching multiple times within a span of hours.   *See e.g.* Exhibit 2 at 61-68.

Defendant Horton also asserts that the investigators failed to pursue combinations of tactics such as mail covers or trash searches, and that had they done so they could have met the goals of their investigations short of needing to intercept wire communications.   He discounts the fact that inspection of mail items would have required warrant authorization and some evidence showing that mail was the means by which the drug conspiracy was communicating or transporting drugs, or that searching trash cans is far more conspicuous in close community than passive visual surveillance.   The investigators appropriately focused on productive and effective investigative tools based on their existing investigation and goals, and offered a detailed reporting to the Judge of exactly what these goals were, and how each of these outlying tactics would be unsuccessful. To put it bluntly, Defendant's Horton's conception of those goals is much more narrow and selective than that actually presented to Judge Robinson.   For example, while it's true that search warrants were executed in connection with some of Jason Brooks' associates in early July of 2018

(Exhibit 2 at 33-35), these efforts only affected a fraction of the larger network connected with Brooks. It clearly didn't assist the investigators in identifying all the facets of Horton's suspected drug trafficking activities with individuals like Jermaine Mikell (exhibit 2 at 45) or Anton Hall, or the joint associates like Pete Spyropoulos. This single incident did not and could not "dismantle or disrupt" the drug organization on its own, as made clear by the fact that the surveillance operation in which Horton, Spyropoulos and Topi all traveled to New York (while maintaining phone contact with Brooks) happened only a few weeks after the search warrant. Exhibit 2 at 61-68. Obviously Mr. Horton would have preferred if only Jason Brooks and his family members were ultimately a target of the investigation and that the investigators simply ignored his own meetings with drug traffickers and all references to "Hock," "Haku," or "Hak,' but ignoring those leads would render an arrest and charging of only Jason Brooks ineffective in shutting down the drug trafficking conspiracy as a whole. Likewise Defendant Horton suggests that Brooks alone was a "source for Horton" according to the investigators and similarly alleges that Anton Hall was likely to be a source rather than Horton, but this is an oversimplification of the drug network that conveniently leaves him uninvestigated and ignores that this network involved multiple tiers of suspected drug traffickers and drug wholesalers, each with various connections to Brooks or Horton. This web of connections was incredibly complex, which is precisely why the investigators properly believed that they had made appropriate efforts to exhaust other investigative techniques and needed to use the tool of wire interceptions to fully meet their goals to identify sources of supply and coconspirators, and to dismantle the operation as completely as possible.

After reviewing the affidavits regarding law enforcement's efforts, Judge Robinson concluded that the "necessary and essential evidence" could not otherwise be obtained through alternative investigative methods, concluding that "normal investigative procedures have been

tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See e.g.* Exhibit 4 at 2.

The Fourth Circuit has held that a reviewing court owes "considerable deference" to the district court's determination that the exhaustion requirement of 18 U.S.C. § 2518(3)(c) was satisfied. *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *Smith*, 31 F.3d at 1298 (declining to announce a standard of review but, after reviewing various standards applied in other circuits, holding that the standard should be one that gives the issuing judge's exhaustion determination "considerable deference"). *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same). Accordingly, Judge Robinson properly determined that the exhaustion requirement was satisfied and it should be accorded the highest degree of deference.

> **C.     The Defendant Has Not Demonstrated the Need for a Franks Hearing, Nor Has He Demonstrated that the Circuit Court Judge Failed To Act as a Neutral and Detached Magistrate.**

The Defendant argues in each of his Motions that errors exist in various warrant affidavits which entitle the Defendant to suppression of evidence and a hearing pursuant to *Franks v. Delaware*, 98 S. Ct. 2674 (1978). In particular he argues that as to each wire interception application he is entitled to a hearing under *Franks* based on a sampling of errors from both the initial Affidavit in support of interception of Lines A, B, C, and from the Affidavit in support of an extension of interception of Lines A, B, C, E, and I. *See* ECF 113. Similarly, the Defendant requests a *Franks* hearing with respect to the search and seizure warrant issued by Judge Robinson for his apartment at 103 W. Conway Street, and as to several warrants to obtain GPS location information for phones used by the Defendant. The alleged errors identified by the Defendant are in separate affidavits, each of which was presented to a Judge of the Circuit Court for Baltimore County, sitting also as a Judge of the District Court of Maryland, independently from one another

over the course of the months-long investigation.  These asserted errors will be addressed in detail below, and to the extent any analysis under *Franks* is warranted at all, each affidavit must be examined on its merits independently.

In *Franks v. Delaware* the Supreme Court laid out the process by which a defendant may request a hearing to challenge a search warrant on the basis that the affiant included a false statement in the affidavit knowingly and intentionally, or in reckless disregard of the truth.  *Franks*, 98 S. Ct. 2674 (1978).  The Fourth Circuit has stated that the purpose of a hearing under *Franks* is to prevent the admission of evidence that was obtained pursuant to a warrant issued only because a magistrate was misled into believing there was probable cause.  *United States v. Friedemann*, 210 F.3d 227, 229 (4th Cir. 2000).  However, there is a presumption in the validity of a lawfully ordered warrant, and the Defendant must meet a high bar in order to establish the need for a hearing under *Franks*.  The Supreme Court in *Franks* explained that in order to mandate a hearing the Defendant must allege deliberate falsehood or reckless disregard for the truth, and support those allegations with a substantial offer of proof.  *Franks*, 98 S. Ct. 2674, at 2684. (1978).  Importantly, even if this showing is made, if when "material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 2684.  Similarly, in *United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990), the Fourth Circuit addressed the applicability of the *Franks* hearing in the context of omitting information from an arrest warrant.  In that case a bank-robbery defendant argued that the affiant of his arrest warrant had omitted information from the affidavit including failures by some witnesses to identify him in photographic arrays and conflicting reports of the height of the bank robber.  The Court held that these omissions did not rise to the level of a violation of *Franks* and further were not material to the finding of probable cause.  *Id.* at 301.  The

Court further rejected the defendant's argument that a warrant affidavit must include all potentially exculpatory evidence, and stated that "omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Id*. at 301.

The Defendant's motions and requests pursuant to *Franks* are not supported by any affidavit of the Defendant, or any other witness.  Instead, the Defendant's motions merely compile a series of typographical errors, bald assertions that the investigators conclusions are unsupported, and alternative interpretations of the underlying intercepted communications.  The Defendant fails to sufficiently show how each of these errors is material to the findings of probable cause for each warrant, and fails to establish that if the allegedly erroneous sections were excised there would no longer exist sufficient probable cause to support each warrant.

Throughout the Defendant's challenges to the probable cause and necessity findings to intercept the Defendant on Lines A, B, C, and D, he also asserts repeatedly that facts were omitted with "reckless disregard" by the investigators.  For example, he complains that the investigators failed to include a full transcript of an intercepted call between Jason Brooks and an earlier unrelated wire target, Tony Bauer.  ECF 113 at 5.  He baldly asserts that this is information which Judge Robinson would "wish to know," and that "it would go towards a finding of probable cause (materiality)." *Id.*  The Defendant is essentially conceding that had this more detailed information been included, it would have actually made the probable cause stronger.  These types of additions are suggested repeatedly by the Defendant, but each of them fails to show how the omissions in any way misled the Judge or that the information that was omitted would have resulted a material *lessening* of the overall probable cause.   In any event, these extra transcriptions and additions are NOT within the four corners of the documents, and the analysis of whether probable cause exists without them is extremely straight forward.  No hearing pursuant to *Franks* is therefore necessary

on the basis of these kinds of purported "omissions" that would in fact have enhanced probable cause and the strength of the investigator's conclusions.

Similarly, the Defendant asserts that investigators failed to include detailed information about the conclusions reached by confidential sources, and that the investigators failed to include information about their reliability or specific dates of their activities.  As discussed above, in fact the investigators described the reliability of the known sources and where possible provided corroborative details and specifics while carefully maintaining the confidentiality of the sources. Perhaps even more importantly, they noted fully when they were unable to find corroboration for reports of the sources and gave a full account of descriptions and nicknames which arguably differed from those of other sources or the investigators own observations.  As above, there is no indication of any willful attempt to mislead Judge Robinson or to omit damaging information, and to the extent that the detail and reliability of a particular source was insufficient, the effect on probable cause can be determined from the warrant itself without the need for a *Franks* hearing. Even if parts of the confidential source information were to be removed from the warrants, there remains ample probable cause through the other surveillance, toll records, and search and seizure warrants conducted by the investigators as these source reports primarily corroborated other research to identify Gary Horton and to directly observe his connections with other drug traffickers.

However, the affidavits at issue were not wholly perfect or devoid of clerical errors, which the Defendant correctly points out.  The majority of the cited errors are found in the affidavit to extend the interception of lines A, B, C, E and I.  However, these minor errors have no adverse effect on the finding of probable cause.  The Defendant makes no showing that these clerical errors were intentionally made by the affiants or that had they been corrected the probable cause would

have been affected adversely.  For example, the Defendant notes that the Affiants incorrectly report an earlier interception order for Brook's E-Line was issued on October 4th, instead of October 3rd – a fact which can easily be corrected and verified by a review of the earlier orders, but which has absolutely no effect on the validity of the facts of the affidavit.  Exhibit 15 at 5.  The Defendant also highlights various times when the call reference numbers connected to transcripts are in error.  In the first of these, on page 13 of the affidavit, the affiants incorrectly label one text message as A-135 (as if from A-Line), when it was actually on E-Line.  Exhibit 15 at 13.  Reading that section in context however makes clear this was an honest typographical error, as they correctly label it as E-135 on the previous page in the included transcript itself.  *Id.* at 12.  Both A-Line and E-Line were phones used by Jason Brooks and this understandable confusion of letters has no impact on fact that these text messages between Foss and Brooks were in fact exchanged.

In the following pages of the Affidavit they similarly mislabel text message reference numbers in reporting a series of text messages also between Brooks and Foss, and again these mistakes have no adverse effect on the probable cause.  A review of the wire logs shows that the text messages transcribed did in fact take place, the affiants simply misreported the call reference numbers in the affidavit.  *See* Exhibit 28 – Wire log of activations E-158 through E-181.  Similarly, occasionally they misreport specific dates or the time of wire calls.  These kinds of errors are bound to occur as affiants work to synthesize a month long investigation into a lengthy affidavit, but in no way demonstrate deliberate falsehoods intended to mislead the Judge, nor a reckless disregard for the truth.  For example, on page 15 of the affidavit they incorrectly report that a surveillance event at Horton's Conway residence took place on October 11 when in reality it occurred on October 12.  Exhibit 15 at 15.  A review of the surrounding pages demonstrates the likely source of this error because a similar interaction between Foss and Brooks ALSO occurred on October

11, 2018 with its own surveillance operation. Exhibit 15 at 11-13. A review of the investigators'
contemporaneously written surveillance reports show that they did in fact surveil Horton's
residence the following day (October 12th) and the observations are exactly as the affiants describe.
Exhibit 29 – Report of October 12, 2018 surveillance operation. In other words, they affiants did
not invent a fictional observation or attempt to mislead the Judge, they simply typed the wrong
date in the affidavit. Similarly, on page 23 of the affidavit they mistakenly report the times of a
series of calls between Albert Linton and Gary Horton using C-Line, but a review of the wire line
sheets shows that these text messages and calls in fact occurred exactly in the order described
during the evening of September 28, 2018, but that the times are reported incorrectly. *Compare*
Exhibit 15 at 23 and Exhibit 30 – Wire log show activation C-128. The fact that the affidavit's
times are not consecutive indicates that this was again a clerical error, rather than a willful
misstatement. Had the timestamps been corrected, the probable cause may have been clearer to
read, but the underlying basis to believe that Horton and Linton were arranging to meet at his 138
West Barre address would have been unaffected. *See* Exhibit 15 at 23. Lastly, the Defendant
correctly points out that the affiants inverted the labels for lines E and I during one call from
Horton's phone to Brook's phone reported on pages 31 and 32 of the affidavit. A review of the
underlying line sheets confirms that this call in fact took place at activation number I-12, and that
Horton's Line-I (443-734-5075) made an outgoing call to Brooks' Line-E (443-743-6101) which
was not answered. *See* Exhibit 31 – Wire log showing activation I-12 and Exhibit 16 at 31-32.
Even if these erroneous sections were to be excised, each affidavit still contains a substantial basis
for the finding of probable cause therein, and therefore a hearing pursuant to *Franks* is not needed
as to any of the warrants attacked by the Defendant.

In his motions, the Defendant asserts that simply because the affiants made typographical errors, or offered conclusions based on their experience and expertise that the Defendant disagrees with, the Judge must have abandoned his role as a neutral magistrate in authorizing the interceptions.  This argument is frivolous and without basis.  As shown above, all of the attacked affidavits are full of detailed information which allowed the Judge to properly find probable cause notwithstanding any minor errors.  Wire interception applications are extremely complex and exhaustive and it is natural for mistakes to happen as the investigators work to marshal the details of a months-long investigation with hours of wire monitoring into a single document.  That all participants, including the Judge, apparently missed a handful of clerical errors in the affidavits does not negate the rest of the evidence supporting the lawful interception of the Defendant's communications and other searches in this case.

Lastly, Defendant's assertion that the investigators failed to provide Judge Robinson with periodic reports is incorrect.  In fact, the affiants provided continuous reports to the Court both in the form of periodic court reports summarizing the progress of interceptions on each line (*See* exhibit 27 – Weekly progress reports) and writing detailed "spin reports" whenever evidence indicated that the Defendants has changed their phone usage patterns and were believed to be using new phone numbers (*See* exhibits 6, 12, and 19).  Progress reports were submitted to summarize each week of interception on 10/1/18, 10/9/18, 10/14/18[3], 10/22/18, 10/29/18, 11/5/18, and finally 11/12/18.  Interspersed within these weeks were the spin reports submitted to allow interception of newly identified phone lines on 10/3/18, 10/9/18, 10/25/18, and 10/26/18.  In addition, as the

---

[3] The Government will note that the progress report detailing the week of 10/8 through 10/14 incorrectly states in the first line that it was submitted on 10/9/18 and that the time range is from 10/18 to 10/14– these dates are clearly out of sequence and appear to be typographical errors. The report reflects that it was reviewed by the Judge on October 15, 2018 and its content is consistent with the 10/8 to 10/14 progress report period.

first 30-day period of authorization for the lines ended, they submitted a detailed affidavit to extend authorization – and did so only for those lines with continued to provide evidence of the drug trafficking conspiracy.  This pattern demonstrates that the investigators kept the Court constantly informed of developments in the case, and gave the Court numerous opportunities to review the investigation and give continued authorization for each new investigative step.  This pattern also demonstrates that the investigators were mindful of their need to minimize interceptions and to pursue only those interceptions which furthered the agreed goals of the investigation, and as a result they ceased interception whenever needed such as when they determined that Line-F (443-686-0698) had been misidentified as connected to Defendant Horton and when Line-D was terminated and not extended.  (Exhibit 14 at 6).  Finally, they concluded their investigation on November 11, 2018 before the expiration to the wiretaps, and therefore terminated their interception as the goals had been reasonably attained.  It is clear that Judge Robinson continuously exercised his duties to supervise this investigation and insure that the wiretap was lawfully and efficiently pursued.

### D.    Judges Robinson's Orders Comply with Both State and Federal Law.

18 U.S.C. §2518 (d)(4) provides that an order authorizing or approving the intercept of any wire, oral or electronic communication shall specify:

> (a) the identity of the person, if known, whose communications are to be intercepted;
>
> (b) the nature and location of the communication facilities as to which, or the place where authority to intercept is granted;
>
> (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;
>
> (d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

> (e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has first been obtained.

Judge Robinson's Ex parte orders related to interception of Lines C, D, I, and L (Exhibits 4, 9, 10, 18, and 24-26) track both the language of 18 U.S.C. §2518(d)(4) and MD Code, Courts and Judicial Proceedings §10-408(d)(1).  The orders set forth the identity of the person(s) known to be intercepted; (Exhibit 4 at 3-4, *e.g.*); the nature and location of the communication facilities as to which authority to intercept was granted (Exhibit 4 at 4, *e.g.*); the type of the communications sought to be intercepted (Exhibit 4 at 4-5, *e.g.*); the identity of the agency being authorized to intercept the communications (Exhibit 4 at 5, *e.g.*); and the period of time for which the interceptions were authorized (Exhibit 4 at 5, *e.g.*).[4]  For the Defendant to claim that the orders are facially deficient is simply without basis.  As discussed in more detail below, the Defendant's claims that the warrants are facially deficient because the Court or Detectives lacked jurisdiction to investigate this drug trafficking conspiracy spanning Baltimore County and the surrounding area are equally without basis, as the interception of all lines was conducted at a listening post in Baltimore County, and because the crime being investigated was a coordinated drug trafficking network with members of the conspiracy conducting their criminal activity throughout, in, and around Baltimore County.

### E.    Good Faith.

Finally, it is clear that Judge Robinson's wiretap orders complied with all aspects of both state and federal law.  The affiants were entitled to rely on the facially valid wiretap orders that the resulting evidence would be admissible pursuant to the "good faith" exception of *United States*

---

[4]  The other orders contain identical language, though the page numbers vary.

*v. Leon*, 468 U.S. 897 (1984).  Leon has been applied to admit electronic surveillance evidence.

*See United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006) (unreported) (even if affidavits

did not set forth probable cause, or that the exhaustion requirements had not been met, affiants

were entitled to rely on facially valid wiretap orders, pursuant to Leon); *United States v. Moore*,

41 F.3d 370 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be

denied, despite defect in order allowing electronic surveillance); *United States v. Malekzadeh*, 855

F.2d1492, 1497 (11th Cir. 1988) (Leon applied to wiretap affidavit that was devoid of deliberately

false or recklessly false information); *United States v. Baranek*, 903 F.2d 1068, 1071-72 (6th Cir.

1990) (recognizing that Congress intended federal wiretap law to incorporate Fourth Amendment

evidence suppression doctrines).  Were the affidavits invalid, which the Government does not

concede they were, the evidence may properly be received under the good faith exception to the

exclusionary rule.

### F.  There Was No Failure to Cease Monitoring, as the Goals and Objectives Had Not Been Achieved.

The Defendant, without any particulars, may adopt the boilerplate arguments by

codefendants that there was a failure by the investigators to cease to monitor the wiretap after the

objectives stated in the orders had been achieved.  The problem with the Defendants' arguments,

aside from the fact that there is no support provided by either Defendant for this claim, is that they

overlook or ignore that the decision as to continue the use of electronic surveillance was not an

unbridled authorization given to the investigators.  Rather, Judge Robinson determined whether

continued electronic surveillance was authorized.  Periodic progress reports were given to the

judge, as well as reports of new phone activity on uncaptured lines.  Moreover, at the expiration

of the initial 30-day period for each line, investigators were required to submit affidavits in support

of further interceptions.  The judge reviewed the extension affidavits and by authorizing continued

interception concluded that further interception was warranted to achieve the objectives set forth in both the initial and extension affidavits.  Additionally, the orders authorizing the interception of the Target Telephones included language that the wiretaps were to terminate, "upon attaining the objectives authorized herein, which are:" followed by the particular objectives as to each subject. *See e.g.* Exhibit 4 at 4-5.

Undoubtedly, Horton would have preferred to have the wiretaps terminate prior to law enforcement discovering his role in the conspiracy and focused only on Jason Brooks, but there was no requirement that they end their investigation without identifying the full contours of the conspiracy.  To the contrary, they had continued authorization to intercept the communications of the Defendants as part of their objectives to develop probable cause to arrest Gary Horton, identify his sources of supply, identify and arrest co-conspirators, and identify and develop probable cause to search and stash locations used by members of the conspiracy.  *See, e.g.* Exhibit 4 at 5.  This mission therefore continued until they were successfully able to execute a series of coordinated arrest and search warrants on the majority of the identified coconspirators on November 15, 2018.

### G.    *There Was No Violation of the Court's Minimization Requirements.*

The Defendant also complains that the investigators failed to comply with the minimization requirements, though he cites no specific calls or communications which should have been minimized but were not, and instead claims that certain calls were actually mistakenly minimized. Maryland's Courts and Judicial Proceedings Article Section 10-408(e) (and its federal counterpart, 18 U.S.C. §2518(5)) provide that:

> Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this subtitle

Judge Robinson's orders explicitly stated that monitoring of conversations was to be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception [...]." *See, e.g.* Exhibit 4 at 8.

In addition, minimization guidelines (*see*, *e.g.*, Exhibit 25), required monitors to take precautions to minimize interception of conversations that did not relate to the enumerated criminal activity. Exhibit 25 at 1. Furthermore, monitors were instructed that spot monitoring for a reasonable period of time up to three minutes was permissible to determine the identity of the parties to the conversation, as well as whether the conversation concerned criminal activities. Exhibit 27 at 1. These guidelines also provided instructions that the target subject (either Jason Brooks, Albert Linton, or Gary Horton, etc., depending on the line), must be a conversant for any call to be monitored, and that the monitored communications must relate to controlled dangerous substance crimes. Exhibit 25 at 3. Further they provided explanations of possible forms of privileged communications that must be minimized. Exhibit 25 at 4-5.

While the Defendant may baldly assert that there was a failure to minimize, there is no indication of any such failures. The minimization requirement does not mean leaving all innocent communications unheard. Unnecessary intrusions are to be reduced as much as possible, but efforts at minimization must be reasonable under the circumstances and reviewed on a case-by-case basis when testing compliance. The Fourth Circuit indicated the rule for this circuit in *Clerkley*, 556 F.2d at 716:

> In analyzing a given case, the federal courts have considered three principal factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed.

While *Clerkley* involved the investigation of illegal gambling, these same factors are applicable to a narcotics conspiracy. In *Clerkley,* the Fourth Circuit observed: "When law

45

enforcement officials are confronted with a large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps." *Id.* The Seventh Circuit, in considering a drug conspiracy, held that "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy." *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975).

Here, there were numerous individuals associated with the conspiracy, whose identities and roles at the time interceptions were authorized were not readily determinable. According to the minimization guidelines in place, agents were permitted to listen to or spot monitor calls up to three minutes in duration. Exhibit 25 at 1. In not every instance will the individuals immediately launch into a discussion about narcotics. As such, the monitors were permitted, even in calls that were initially minimized, to listen further to determine whether the conversation continues to be that which would be non-pertinent to the investigation using a spot-monitoring technique at 15-20 intervals. *Id.* As the Eighth Circuit in *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) noted:

> [W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.

*Id.* at 1300-01.

Indeed, it is impossible to determine at the outset whether a particular conversation is irrelevant until it has been terminated. "It is all well and good to say, after the fact that certain conversations were irrelevant and should have been terminated. However, monitoring agents are

not gifted with prescience and cannot be expected to know in advance what direction a conversation will take." *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).

Because there is no inflexible rule to determine reasonableness, many circumstantial factors must be considered, including the number of short calls intercepted, whether the surveillance target is part of a widespread conspiracy, what type of telephone line is being monitored, at what point in the investigation the interception took place, and whether the conversation being intercepted is ambiguous. *See Scott v. United States* 436 U.S. 128, 140-42 (1978). Several of the factors recognized in the case law are germane to this case.

First, when an investigation involves a drug ring of unknown proportion, "the need to allow latitude to eavesdroppers is close to its zenith." *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000). Compared to a single criminal episode, "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception." *Quintana*, 508 F.2d at 874. Allowing leeway is especially important when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped." *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989); *see also United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994).

In this case at the time when the wiretaps began, investigators knew that Gary Horton was using C-line in furtherance of his drug trafficking activities and learned of the Defendant's connection through toll analysis and other investigative steps. There were, however, still many unknowns. In many instances, investigators did not know the identities of numerous co-conspirators. Each time investigators intercepted a person who appeared to be involved in the drug activity, they tried to gather sufficient information from the intercepted conversations and elsewhere to identify that person and determine his/her role in the conspiracy. This bedrock

investigative task required close listening to conversations between the known targets and unknown parties, in which the conversation touched on the activities of other individuals and co-conspirators.

The contents of the intercepts themselves posed additional complicating factors.  Courts have recognized that when conspiracies utilize "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway."  *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989); *see also*, *United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992); *Daly,* 535 F.2d at 441.

Additionally, monitored conversations occasionally start with discussion of non-criminal matters, a fact that did "not require the government to plug its ears."  *United States v. Wilson*, 835 F.2d 1440, 1445 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010); *see also United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002).  Because participants in a conspiracy may "often discuss[] personal and criminal matters in the same conversations," *Wilson*, 835 F.2d at 1445, it is unreasonable for monitoring agents to cease monitoring every time non-criminal matters are mentioned.

The thoroughness of the investigators' precautions to bring about minimization and the degree of judicial supervision over the surveillance practices, both of which provide strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation. *Charles*, 213 F.3d at 22; *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing Government's procedures and judicial supervision as factors tending to show Government's compliance with minimization requirement).

First, law enforcement took a number of reasonable precautions to minimize the possibility of intercepting non-pertinent conversations. The minimization guidelines, orders, and affidavits explained, among other things, the authorized objectives of the investigation, the offenses and known individuals under investigation, the sorts of calls that were anticipated, and, most critically for present purposes – the importance of identifying patterns of involvement and non-involvement, and of minimizing and "spot checking" non-pertinent conversations. With respect to the extent of judicial supervision, "[w]here the authorizing judge has required and reviewed ... reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted." *United States v. Armocida*, 515 F.2d 29, 44-45 (3rd Cir. 1975) (citing *United States v. James*, 494 F.2d 1007, 1021 (D.C. Cir. 1974)); *see also United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997). In this case, the Court orders required that prosecutors make periodic reports every week regarding the progress of the investigation, and the officers submitted periodic reports as required. These reports provided Judge Robinson summaries of the pertinent interceptions and thus with continuing probable cause to support the ongoing interceptions. Accordingly, the degree to which Judge Robinson supervised these wiretaps ought to inform the Court's assessment of the Government's reasonable efforts to minimize. *Eiland*, 398 F. Supp. 2d at 175.

In assessing a defense minimization challenge, courts generally draw a line at the two- or three-minute mark and exclude such short-duration calls from consideration. *See, e.g.*, *United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes."); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir.1992) (court was reluctant to conclude that listening to all calls for two minutes or less

irrespective of relevance violated minimization requirements); *Cleveland*, 964 F. Supp. at 1092-94 (excluding calls less than three minutes in duration); *see also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) ("Following *Scott*, some courts have held that calls less than two minutes do not require minimization.  We certainly agree that minimization of short calls is not required."); *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir.1976) (monitoring all calls for a maximum of five minutes not unreasonable where interceptees frequently communicated in code and where discussions initially personal often turned later to criminal conduct).  Particularly in a case as this one, the rationale for listening to the first several minutes of a conversation is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed."  *Scott*, 436 U.S. at 142.

Even if this Court were to find that there was a failure to minimize some of the calls, the remedy should not be the suppression of all the intercepted conversations.  *See Cox*, 462 F.2d at 1301-1302; *United States v. Sisca*, 361 F.Supp735, 746-747 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874-877 (E.D. N.Y. 1972).  The Defendants have not directed the Court to even a single call, which should have been minimized but was not.  At most, what would be suppressed is any call that the Defendants have identified and the Court concludes should have been minimized, but was not.  It is nonsensical to argue, as Horton does, that a call was prematurely minimized, and any such error has no bearing on the communications which were in fact intercepted.

## II.   The Orders Authorizing the Installation of Pen Register/Trap and Trace Devices for Telephone Number 443-943-5127 were Properly Issued and the Defendant's Request for Suppression Should be Denied.

Defendant Horton raises two challenges to the pen register orders entered by the Circuit Court for Baltimore County on July 17, 2018 and September 18, 2018.  First, Horton claims that

the orders are invalid because the orders did not include the name "Gary Horton" as the person who is the subject of the criminal investigation.  *See* ECF No. 111 at 1-2.  Second, Horton claims that the orders are invalid because the trap and trace device was without geographic limitation.  *Id.* at 3-5.  As explained below, Horton's challenges to the July Pen Register Order and the September Pen Register Order are without merit.  But even assuming that the orders are somehow deficient, suppression is not the appropriate remedy.  Therefore, Horton's motion should be denied.

The Maryland pen register statute provides in pertinent part: "[A] person may not install or use a pen register or a trap and trace device without first obtaining a court order under § 10–4B–04…." Md. Code, Cts. & Jud. Proc. § 10-4B-02(a).[5]  Pursuant to § 10-4B-03(a), "[a]n investigative or law enforcement officer may make application for an order … under § 10-4B-04 … authorizing or approving the installation or use of a pen register or a trap and trace device, in writing, under oath or equivalent affirmation, to a court of competent jurisdiction of this State." *Id.* § 10-4B-03(a).  The term "court of competent jurisdiction" is defined as "any [Maryland] circuit court having jurisdiction over the crime being investigated regardless of the location of the instrument or process from which a wire or electronic communication is transmitted or received." *Id.* § 10-4B-01(b). The application must include "[t]he identity of the State law enforcement or investigative officer making the application and the identity of the law enforcement agency conducting the investigation," accompanied by "[a] statement under oath by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency."  *Id.* § 10-4B-03(b). Authorization may be obtained *ex parte,* provided that the

---

[5]  Maryland's pen register statute is substantially similar to its federal counterpart.  *See* 18 U.S.C. §§ 3122, 3123.

issuing court "finds that the information likely to be obtained by the installation and use is relevant to an ongoing criminal investigation." *Id.*

> An order authorizing the installation and use of a pen register must:
>
> (1) Specify the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied;
>
> (2) Specify the identity, if known, of the person who is the subject of the criminal investigation;
>
> (3) Specify the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of a trap and trace device, the geographic limits of the trap and trace order;
>
> (4) Contain a description of the offense to which the information likely to be obtained by the pen register or trap and trace device relates; and
>
> (5) Direct, upon the request of the applicant, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device under § 10-4B-05 of this subtitle.

*Id.* § 10-4B-04(b).

Here, Horton argues that the July Pen Register Order and the September Pen Register Order are deficient because those orders did not specify Horton as the individual who was the subject of the criminal investigation even though, according to Horton, law enforcement was aware of his identity when those orders were issued. With respect to the July Pen Register Order, Horton cites to Page 41 of the "Wiretap Affidavit" and claims that law enforcement knew that he was the person using phone number 443-943-5127. But Horton ignores that the first wiretap in this investigation was authorized pursuant to an affidavit and order dated September 21, 2018, which was more than two months after the July Pen Register Order was issued. The fact that law enforcement was able to identify Horton at some point *after* the July Pen Register Order provides no support for Horton's argument that law enforcement was aware of his identity as of July 17, 2018. In fact, the opposite

is true.  The July 17, 2018 Pen Register Application specifically stated that "Detective Trageser has exhausted all known investigative measures attempting to identify the subject utilizing phone number 443-943-5127 with negative results."  ECF No. 111-2 at 8.  Horton has cited nothing to suggest otherwise.  Given that it was not known that Horton was using phone number 443-943-5127, the July Pen Register Order was not deficient.  *See* Md. Code, Cts. & Jud. Proc. § 10-4B-04(b)(2) (requiring the pen register order to "[s]pecify the identity, *if known*, of the person who is the subject of the criminal investigation") (emphasis added).

Regarding the September Pen Register Order, Horton is correct that law enforcement was aware that Horton was the person using phone number 443-943-5127 as of September 18, 2018.  Even though the September Pen Register Order does not list his name, the Order was signed pursuant to the information contained in the corresponding Application, which identified Horton by name as the person using phone number 443-943-5127.  *See* ECF No. 111-3 at 8.   The Order, in turn, specified "that information relevant to the ongoing criminal investigation of subject utilizing phone number 443-943-5127."  *Id.*  Horton does not cite authority for the proposition that this reference is insufficient to comply with § 10-4B-04(b)(2).   In any event, Horton cites no authority to suggest that a pen register order that contains a technical deficiency should be suppressed.  To the contrary, suppression is not the appropriate remedy, as explained below.

Horton also argues that the July Pen Register Order and the September Pen Register Order are deficient because, as to the trap and trace device, the orders stated that those features were "unlimited geographically."  *See* ECF No. 111 at 3-4.  Horton is incorrect that this renders the orders deficient.  To be sure, the statute requires that the order specify "the geographic limits" of a trap and trace order.  *See* Md. Code, Cts. & Jud. Proc. § 10-4B-04(b)(3).  Here, the orders specified that they were "unlimited geographically."  ECF Nos. 111-2 at 2, 111-3 at 13.  This

satisfied the statutory requirement that any geographic limit be specified.  Horton cites no legal authority for the proposition that orders under Sections 10-4B-03 and 10-4B-04 cannot be "unlimited geographically."

Horton also argues in passing that because the orders were issued by the Circuit Court for Baltimore County, the pen register and trap and trace devices "could only be used while the device is in Baltimore County."  ECF No. 111 at 4-5.  Like most of Horton's arguments, he does not cite legal authority to support his assertion.  Worse yet, the argument is flatly wrong.  Indeed, under the statute, a pen register/trap and trace order can be issued by a "court of competent jurisdiction," which is defined as "any [Maryland] circuit court having jurisdiction over the crime being investigated *regardless of the location of the instrument or process from which a wire or electronic communication is transmitted or received*."  Md. Code, Cts. & Jud. Proc. § 10-4B-01(b) (emphasis added).  The statute specifically contemplates that the device need not be located in the county from which the order was issued, as long as it is issued by a circuit court having jurisdiction over the crime being investigated.

Even assuming that the July Pen Register Order or the September Pen Register Order had technical deficiencies, suppression is not the remedy.  As this Court has recognized, there is no statutory suppression mechanism for violations of Maryland's pen register statute.  *See United States v. Wilford*, 961 F. Supp. 2d 740, 770 (D. Md. 2013) (Hollander, J.); *see also Kin Chan v. State*, 552 A.2d 1351, 1362 (Md. Ct. Spec. App. 1989) (holding suppression remedy unavailable for evidence obtained in violation of Maryland's pen register statute because "[n]one has ever been created to handle violations of pen register statutes, either at the Federal or state level," and "[t]herefore, none exists").  Indeed, a person who violates the relevant statute is subject to a fine or period of imprisonment.  *See* Md. Code, Cts. & Jud. Proc. § 10-4B-02(c).  Those penalties

represent "the sum total of available sanctions for violating the Maryland statue." *Kin Chan*, 552 A.2d at 1362. Nor is there federal constitutional suppression, as that remedy is predicated upon a finding of a Fourth Amendment violation. *See Herring v. United States*, 555 U.S. 135, 139–40 (2009). But "[t]he installation and use of a pen register is not … a 'search' under the Fourth Amendment." *Andrews v. Baltimore City Police Dep't*, Civ. No. CCB-16-2010, 2018 WL 3649602, at *8 n.8 (D. Md. Aug. 1, 2018).

Finally, Horton has failed to make the threshold showing necessary for a *Franks* hearing, and his request should be denied. *See Franks*, 438 U.S. at 155-56 (requiring the defendant to "make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"); *United States v. Chandia*, 514 F.3d 365, 373 (4th Cir. 2008) (explaining that a *Franks* hearing is not required where a motion to suppress made only "bare allegations" and failed to make a "substantial preliminary showing"). For all of these reasons, Horton's request to suppress either the July Pen Register Order or the September Pen Register Order should be denied.

### III. The Orders Authorizing Initial GPS Tracking and the Renewed GPS Tracking of the Cellular Telephone Assigned Call Number 443-943-5127 were Properly Issued and the Defendant's Request for Suppression Should be Denied.

Defendant Horton seeks to suppress three orders entered by the Circuit Court for Baltimore County, which authorized the real-time GPS tracking of the cellular telephone assigned call number 443-943-5127. Those orders were entered on May 10, 2018, July 17, 2018, and August 16, 2018 pursuant to Section 1-203.1 of the Criminal Procedure Article of the Maryland Code. Horton claims that Section 1-203.1 is unconstitutional and, relatedly, that the use of cell site simulator technology by law enforcement is also unconstitutional. Horton further argues that the applications and orders failed to comply with the requirements of Section 1-203.1 for a variety of

reasons.  As explained below, all of Horton's contentions are without merit and his motion should be denied.

In 2014, Maryland's General Assembly passed a statute, codified at Section 1-203.1 of the Criminal Procedure Article of the Maryland Code, which established a specific procedure for law enforcement to obtain judicial authorization for location tracking of cellular telephones upon the showing of probable cause.  *See* Md. Code, Crim. Pro. § 1-203.1.  The statute provides that a court may issue an order permitting a law enforcement officer to obtain real-time location information from an electronic device based on a finding of probable cause that:

> (i)  a misdemeanor or felony has been, is being, or will be committed by the owner or user of the electronic device or by the individual about whom location information is being sought; and

> (ii) the location information being sought:

>> 1.  is evidence of, or will lead to evidence of, the misdemeanor or felony being investigated; or

>> 2.  will lead to the apprehension of an individual for whom an arrest warrant has been previously issued.

Md. Code, Crim. Proc., § 1-203.1(b)(1).

Horton argues that Section 1-203.1 is unconstitutional because, according to Horton, it allows a court to authorize the use of a cell site simulator without any geographic limitation. Horton claims that this would run afoul of the Fourth Amendment because it would permit law enforcement to effectively conduct the search of a home without any safeguards if a phone is located inside of a home.  Horton also makes a related argument that the use of cell site simulators by law enforcement is unconstitutional in all circumstances, even if law enforcement officers first obtain a warrant supported by probable cause.  Horton's arguments are flawed for a variety of legal and factual reasons.

As a threshold matter, Horton's arguments are factually irrelevant because law enforcement did not use a cell site simulator to gather any evidence in this case. Although the challenged warrants authorized the use of a cell site simulator as one method by which law enforcement could track 443-943-5127, law enforcement did not employ that method. Instead, law enforcement obtained location data for 443-943-5127 from the cellular service provider. Law enforcement did not, as Horton claims, use a cell site simulator at any time during this investigation. For this reason alone, all of Horton's arguments about cell site simulators are irrelevant and do not support suppression of the GPS tracking warrants.

With regard to Horton's legal argument that Section 1-203.1 is unconstitutional, Horton selectively and misleadingly quotes from *State v. Andrews*, 134 A.3d 324 (Md. Ct. Spec. App. 2016) to argue that cell site simulators run afoul of the Fourth Amendment, even if used pursuant to a warrant after a finding of probable cause. *Andrews* says nothing of the sort. In *Andrews*, law enforcement employed a *warrantless* cell site simulator. In assessing the Fourth Amendment implications of this investigative technique, the Court of Special Appeals held that "the government's use of a cell site simulator to obtain location information directly from an individual's cell phone is a 'search' under the Fourth Amendment, and, therefore, requires a warrant based on probable cause." *Andrews*, 134 A.3d at 354. The court then considered whether the state's a pen register/trap and trace order operated as the equivalent of a warrant. *Id.* In holding that a pen register order did not meet the requirements of a warrant and was insufficient to authorize law enforcement's use of a cell site simulator, the court reasoned:

> To allow the government to collect real-time location information on an unknown number of private cell phones, without any geographic boundaries, without any reporting requirements or requirements that any unrelated data be deleted, and without a showing of probable cause that contraband or evidence of a particular crime will be found through the particular manner in which the search is conducted

would certainly run afoul of the Fourth Amendment.  As stated in our holding above, unless a valid exception to the warrant requirement applies, *the government may not use a cell phone simulator without a warrant or, alternatively, a specialized order that requires a particularized showing of probable cause*, based on sufficient information about the technology involved to allow a court to contour reasonable limitations on the scope and manner of the search, and that provides adequate protections in case any third-party cell phone information might be unintentionally intercepted.

*Id.* at 360-61 (emphasis added).  As the above-quoted language makes clear, the analysis in *Andrews* is limited to circumstances in which law enforcement utilizes a cell site simulator without first obtaining judicial authorization based on a finding of probable cause.  Indeed, the cell site simulator at issue in *Andrews* was utilized *before* Section 1-203.1 took effect.  Accordingly, Horton's selective quotation of *Andrews* does not support suppression.

Moreover, contrary to Horton's suggestion, the orders authorizing the use of cell site simulators in this case were not limitless.  Indeed, the orders themselves required law enforcement to avoid collection of any information from a cellular device other than the target cellular device, 443-943-5127.  If any information from another cellular device was collected, law enforcement was required to delete the information and make no investigative use of the information.

With regard to Horton's other challenges, Horton claims that the GPS tracking warrants did not satisfy the requirement of Section 1-203.1.  As explained above, Section 1-203.1 authorizes the GPS tracking of an electronic device if a judge finds probable cause to believe that a crime has been or is being committed by the user of the electronic device and that the location information being sought is evidence of, or would lead to evidence of, the crime being investigated.  Md. Code, Crim. Proc., § 1-203.1(b)(1).  All of the GPS tracking orders challenged by Horton satisfy these requirements and the orders were supported by ample probable cause.  With regard to the May 2018 order, Detective Trageser described a drug trafficking investigation into an individual named Antwon Hall, as well as the identification of phone number 443-943-5127 as a number with

numerous contacts with Hall.   Detective Trageser also described a high volume of contacts between the user of 443-943-5127 and other subjects who were under investigation for narcotics trafficking.   When seeking the July 2018 order, Detective Trageser further summarized information provided to law enforcement by a confidential source concerning narcotics trafficking by individuals communicating with the user of 443-943-5127.   He also included quoted excerpt from text messages obtained by law enforcement pursuant to a text message search warrant for 443-943-5127, which Detective Trageser believe were drug related, based on his training and experience.

Horton takes issues with several statements from the July 2018 affidavit, none of which have an impact on the probable cause determination.   For instance, Horton states that the affidavit "fails to provide details as to the amount of contacts 443-943-5127 had with 443-608-9793, or what dates these alleged contacts occurred."   ECF No. 115 at 7.   Horton also states that the affidavit should have provided the judge with "name and verifiable phone numbers" of individuals who were under investigation for narcotics crimes and who communicated with 443-943-5127.   But Horton does not cite any legal authority for the proposition that any of these details were required nor does he explain how this information would have somehow defeated probable cause.   Horton takes issue with several other statements in the affidavit, but he makes no showing that his challenges would have rendered the warrant not supported by probable cause.

Horton also claims that the July 2018 order is invalid because the order did not include the name "Gary Horton" as the person who was the subject of the criminal investigation.   According to Horton, law enforcement was aware of his identity when the July 2018 order was issued.   Horton cites to Pages 36 and 41 of the "Wiretap Affidavit" and claims that law enforcement knew that he was the person using phone number 443-943-5127 by July 11, 2018.   Horton is incorrect.   The

reference to July 11, 2018 says nothing about the user of the telephone. And Horton ignores that the first wiretap in this investigation was authorized pursuant to an affidavit and order dated September 21, 2018, which was more than two months after the July 2018 GPS tracking order was issued. The fact that law enforcement was able to identify Horton at some point *after* the July 2018 GPS tracking order provides no support for Horton's argument that law enforcement was aware of his identity as of July 17, 2018. Indeed, Detective Trageser specifically stated that he had "exhausted all known investigative measures attempting to identify the subject utilizing phone number 443-953-5127 with negative results." EF No. 115-2 at 9.

Finally, the motion to suppress should be denied because as to each GPS tracking warrant, the executing officers relied in good faith on a facially valid warrant. The exclusionary rule does not apply when law enforcement officers act in "objectively reasonable" reliance on a warrant later held invalid. *Leon*, 468 U.S. at 922. Nor has Horton met the threshold showing to justify a *Franks* hearing in this case. *See Franks*, 438 U.S. at 155-56 (requiring the defendant to "make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"); *Chandia*, 514 F.3d at 373 (explaining that a *Franks* hearing is not required where a motion to suppress made only "bare allegations" and failed to make a "substantial preliminary showing").

For all of the reasons described above, Horton's motion to suppress the GPS tracking orders should be denied.

## IV.   Defendant's Motions to Suppress Tangible Evidence Should be Denied Because the Evidence Was Lawfully Obtained Pursuant to a Search Warrant that was Supported by Probable Cause.

Defendant Gary Horton has moved to suppress evidence seized during the November 15, 2018 search of 103 W. Conway Street, *see* ECF No. 111, as well as earlier warrants used to obtain

location data and phone call history data, *see* ECF Nos. 112 and 115.  In his motions Horton raises

a number of objections to the jurisdiction of the investigating officers and the warrant issue Judge,

as well as disputes to the probable cause statements of the warrants.  The GPS location and Pen

Register applications have already been discussed above.  For the additional reasons described

below, Horton's challenge to the searches should be denied.

>    **A.    The Search Warrant for 103 W. Conway Street Was Supported
>    Probable Cause based Observations and Intercepted Communications
>    Establishing the Defendant's Ongoing Drug Trafficking Activities
>    and Firearms Possession.**

The Fourth Amendment protects all people against unreasonable searches and seizures and

requires that all warrants authorizing a search or seizure must be supported by probable cause.

U.S. Const. Amend. IV.  Once a search warrant has been issued, review of the probable cause

determination by a judicial officer is to be shown "great deference."  *United States v. Blackwood*,

913 F.2d 139, 142 (4th Cir. 1990); *see also United States v. Williams*, 974 F.2d 480, 481-82 (4th

Cir. 1992) (reversing district court's order suppressing evidence seized pursuant to a search

warrant and highlighting the degree of deference to be given to a magistrate's determination of

probable cause).  "[T]he task of the reviewing court is not to conduct a *de novo* determination of

probable cause, but only to determine whether there is substantial evidence in the record supporting

the magistrate's decision to issue the warrant."  *Massachusetts v. Upton*, 466 U.S. 727, 724 (1984).

The Supreme Court has described probable cause to search as "a fair probability that

contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S.

213, 238 (1983).  "The probable cause standard is not defined by bright lines and rigid boundaries."

*Williams*, 974 F.2d at 481.  "In order to establish probable cause, the facts presented to the

magistrate need only warrant a man of reasonable caution to believe that evidence of a crime will

be found."  Id. (internal quotation marks omitted).  Indeed, a judicial officer's determination that

there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Gates*, 462 U.S. at 235 (1983). Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false."). The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002).

Moreover, the Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005). Thus, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the place to be searched. *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). With respect to narcotics trafficking, a number of other courts of appeals, including the Fourth Circuit, have held that evidence of involvement in the drug trade is likely to be found where the narcotics trafficker resides. *See id.* at 218 (reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key); *see also United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999) (reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug

trafficking was observed to occur there); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986) (probable cause for search of drug dealer's apartment, even though he was not seen using the apartment); *United States v. Williams*, 974 F.2d 480, 481-82 (4th Cir.1992) (totality of facts establishes fair probability that drug paraphernalia will be found in drug dealer's motel room); *United States v. Davidson*, 936 F.2d 856, 859-60 (6th Cir. 1991) (police had probable cause for the issuance of a search warrant since the affidavit revealed a substantial basis for concluding that a search of the defendant's residence would uncover evidence of wrongdoing); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept … and … in the case of drug dealers evidence is likely to be found where the dealers live.") (quoting *United States v. Reddick*, 90 F.3d 1276, 1281 (7th Cir. 1996)).

Turning to the use of no-knock authority to allow entry into a premises without announcing first, the court must look to the individual facts of the case to determine exigency.  The Fourth Circuit has explained "that non-compliance with knock and announce requirements may be excused where exigent circumstances render strict compliance imprudent."  *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) (citing *United States v. Lalor*, 996 F.2d 1578, 1584 (4th Cir. 1993); *United States v. Nabors*, 901 F.2d 1351, 1354 (6th Cir. 1990); *United States v. Spinelli*, 848 F.2d 26, 28 (2d Cir. 1988)).  The Court further explained that this is a factual determination for each case, and that both an opportunity for destruction of evidence and or for occupants to prepare an attack against the officers would be equally valid reasons to establish that exigency.  *Id.* (Citing *United States v. Bonner*, 874 F.2d 822, 826 (D.C. Cir. 1989).  While the Court's precedent allows for executing officers to make this determination on their own at the time of execution, in the instant case the affiants made an affirmative presentation of their reasons and sought direct

authorization from Judge Robinson to conduct the no-knock entry.  The Fourth Circuit addressed this practice in *United States v. Singleton*, stating that "police often can (and perhaps should) investigate and assess these exigent circumstances before the time of the search..." and concluding that no purpose is served by having the officers wait to determine this if preexisting exigencies are exist.  *Singleton*, 441 F.3d 290, 295 (4th Cir. 2006).  In *Singleton* the Court analyzed an affidavit in which the affiants based their exigency argument primarily on the Defendant's prior violent convictions, the visibility of the officers approaching the apartment location, and the fact that the area had a history of shootings and violence.  *Id.* at 293.  Even questioning this basis as sufficient, the Fourth Circuit upheld the no-knock execution, holding that the *Leon* good-faith exception applies to a no-knock warrant and that exclusion of evidence was not warranted.  *Id*. at 294-295.

A review of the search warrant affidavits in this case reveals that ample probable cause supported the issuance of each search warrant.  In the affidavit in support of the warrant for 103 W. Conway Street, the co-affiants begin by summarizing the wiretap investigation into Gary Horton, which is of course was already known to J. Robinson in detail based on the wiretap affidavits and court reports which proceeded it.  They however go on to give specific instances over the course of the preceding months in which Gary Horton was in direct communication with other suspected drug traffickers including Steven McGeeney and Albert Linton.  The calls and pattern with Linton give the clearest indication of Horton's ongoing pattern – they speak on the phone about the status of what the investigators believe to be drug deliveries, and then meet at or near Horton's address at 103 W. Conway Street.  In the late September calls this pattern is particularly distinct because Linton reports on September 30, 2018, after an earlier exchange days before, that things are "half way, some things are ok, everything that you're trying will still be ok but somethings already had happened."  Exhibit 26 at 6.  Following this call Linton goes to

Horton's residence and brings a dark backpack bag with him.  Exhibit 26 at 7.  Then, the very next day, Linton goes back a second time bringing the same dark backpack.  As the investigators explain based on their training and experience, this phone call stating "halfway" and "everything you're trying will still be ok" was likely referencing that only half of the expected delivery could be made on September 30th, and the follow up on October 1st corroborates this interpretation. This pattern then repeats a month later on November 2nd and 3rd, indicating that the drug trafficking business between Horton and Linton was ongoing and giving probable cause for the investigators to believe that Horton's 103 W. Conway Street residence would contain evidence of that ongoing business. As the affiants go on to state, based on their training and experience, drug traffickers "maintain on hand large amounts of both CDS and currency in order to maintain and finance their ongoing drug business…" as well as drug manufacturing paraphernalia, records, and other potential evidence. Exhibit 26 at 12.

However, the meetings with Linton were only one portion of the underlying probable cause.  Equally notable is the call with Steven McGeeney at the end of September which spans from drug talk through to detailed discussion of firearms.  Exhibit 26 at 5.  During this call they explicitly discuss the quality of suspected narcotics that Horton has available, with Horton saying "No this shit is better yo, they said it's got a good smell and taste."  *Id*.  In context with Horton's apparent resupply by Linton, the meaning of this call is even clearer.  In his motion the Defendant disputes this interpretation, but there is no basis to substitute his opinion for that of the trained narcotics investigators.  His inference that the call being minimized in part somehow negates the affiant's interpretation is without merit – the facts of the call are clearly presented and provide a substantial basis for the Judge to find probable cause even if they were arguably prematurely minimized by the wire monitor.

Of course, the second half of the McGeeney call is also significant, particularly as the basis for no-knock entry - the two men are openly discussing the sale of a Taurus handgun and boxes of hollow-tip ammunition.  As the investigators lay out, Horton is convicted drug felon, and therefore prohibited from possessing a firearm.  Exhibit 26 at 11.  Again, the Defendant challenges the interpretation of the affiants by supplanting it with his own interpretation – arguing that this call actually shows that Horton did not purchase the gun and there is no evidence that the described transaction took place.  *See* ECF 111 at 4.  His interpretation ignores the exchange in which McGeeney talks about how hard it is to find a gun like this saying "[…] for me they are hard to find yo, I've been looking for one for the last two years.", and Horton responds "You never asked me."  Arguably Horton is stating that he has or had a Taurus handgun, a fact which proved true at the execution of the warrant.  Though this was obviously not known at the time the affidavit was authored, it illustrates that Horton's alternative narrative is counter to the facts.  Key to the analysis here though is that the affiants are clear in their recounting of this pattern of calls – they do not claim Horton was buying the gun himself, but that he was apparently brokering the deal for another person.  Based on the call alone it appears that this 3rd party is able to quickly respond to Horton that "he will give you $400 for it" and "he said he will take it for that if you are going to give him the accessories."  Exhibit 26 at 5.  There is every indication that whoever is buying the gun is using Horton to facilitate the sale and is potentially with Horton in person.  Even if this exchange doesn't conclusively prove that Horton in fact bought the Taurus, it provides ample reason for the affiants and the Judge to believe that Horton has ready access to this or other firearms.  Because of this, and the stated connection between drug trafficking and firearm possession (*See* Exhibit 26 at 12) there was substantial basis for the Judge to have found that there was probable cause to believe that a firearm would be found the residence and that there is a threat to the safety of the officers

supporting their request for a "no-knock" warrant.  Though not stated expressly in the warrant, it is also true that drug evidence can be disposed of or destroyed quickly if the occupants are given time to react to police presence, so destruction of evidence could also be a valid additional concern of the officers executing the warrant.

This warrant contained a substantial bases for Judge Robinson to find probable cause both that firearm and narcotics evidence would be inside the residence and that the officers had a reasonable basis to believe Horton was armed and posed a danger.  Based on these appropriate findings, Defendant Gary Horton's challenge to the search warrants issued in this case should be denied.

**B.     Even if this Court Finds Probable Cause Did Not Exist for the Issuance of a Specific Warrant, the Officers Relied in Good Faith on Warrants Issued by a Judge of the Circuit Court for Baltimore County.**

Even if the Court has doubts about the quantum of probable cause supporting any of the warrants issued in this investigation, the motion to suppress should be denied because at each step, the executing officers relied in good faith on a facially valid warrant.  The exclusionary rule does not apply when law enforcement officers act in "objectively reasonable" reliance on a warrant later held invalid.  *Leon*, 468 U.S. at 922.  Without any persuasive basis beyond clerical errors, the Defendant claims that the issuing judge was not neutral and detached, *see Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979), and was misled by information in the affidavit that the affiants knew was false or would have known was false except for their reckless disregard of the truth, *see Franks v. Delaware*, 438 U.S. 154 (1978).  This type of conclusory assertion is insufficient and should be rejected.  *See Franks*, 438 U.S. at 155-56 (requiring the defendant to "make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"); *United States v. Chandia*, 514

F.3d 365, 373 (4th Cir. 2008) (explaining that a *Franks* hearing is not required where a motion to suppress made only "bare allegations" and failed to make a "substantial preliminary showing"). As discussed in more detail above, the Defendant's assertions that the Judge and the Investigators lacked jurisdiction to issue and investigate the Baltimore City residence are without merit.  First of all, while Judge Dennis Robinson is a Circuit Court Judge for Baltimore County Maryland, he was also vested by the Maryland Court of appeals with authority as a Judge for the District Court of Maryland and therefore had jurisdiction to authorize warrants in any part of the State of Maryland.  *See* Exhibit 32 – Order designating particular Baltimore County Circuit Court Judges as District Court Judges.  Similarly, the investigators on the case had full authority to investigate this broad reaching drug conspiracy which was taking place both in Baltimore County and in Baltimore city.  As described in the various affidavits, Horton and Brooks frequently met with coconspirators outside of Baltimore city, and other members of the conspiracy operated throughout Baltimore city and the County.  In any event, the investigative team and affiants were not limited to Detectives with the Baltimore County Police Department, but included task force officers with Homeland Security Investigations who have authority to investigate drug trafficking activity throughout the district of Maryland.  Similarly, the Search warrant was executed by team consisting of Baltimore City Police department SWAT officers and members of DEA group 54, which operates in and around Baltimore City.  The affiants on the warrant and the officers who executed it had a validly issued warrant and full authority to execute that warrant.

Moreover, the affidavits contained "sufficient indicia of probable cause so as not to render reliance on [them] entirely unreasonable." *Bynum*, 293 F.3d at 197-99; *United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994).  Indeed, the Fourth Circuit has applied the *Leon* good faith exception to the exclusionary rule in circumstances where the statement of probable cause was far

more bare bones than the ones at issue here.  *See, e.g.*, *United States v. Williams*, 548 F.3d 311, 322-23 (4th Cir. 2008) (bare assertion that the targeted dwelling was known to be the defendant's, without explaining how); *United States v. Harris*, 215 F. App'x 262, 272 (4th Cir. 2007) (unreported) (no indication that the defendant lived in the targeted premises, let alone grounds for believing so).

The affidavits in this case described several months of investigation with multiple corroborating pieces of information, including court-authorized intercepted communications and physical surveillance.  Nothing in these affidavits would cause a reasonable law enforcement officer to doubt the validity of the warrants.  Accordingly, the officers were entitled to rely in good faith on the warrants.

## CONCLUSION

For all of the above reasons the Government respectfully requests that the Defendants' pre-trial motions be denied.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:        _____/s/_____
Jeffrey M. Hann
Special Assistant United States Attorney
Anatoly Smolkin
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Tel.: (410) 209-4800
Fax: (410) 962-3124
Jeffrey.Hann@usdoj.gov
Anatoly.Smolkin@usdoj.gov

Dated:   June 12, 2020

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of June, 2020, a copy of the foregoing Government's Response to Defendant's Pre-Trial Motions was electronically filed with notice to counsel of record:

Christopher Nieto for Justin Akonom

Alan Bussard for Patrick Berlin

Justin Brown for Jason Brooks

Jose Molina for Eric Foss

Ryan Burke for Gary Horton

Creston Smith for Antwan Lee

Warren Brown for Pete Spyropoulos

_____/s/_____
Jeffrey M. Hann
Special Assistant United States Attorney
Anatoly Smolkin
Assistant United States Attorney

# U.S. v. JUSTIN AKONOM et al.
# ELH-19-0115
# EXHIBITS

**Exhibit 1:**      **Ex Parte Application for Interception of C-Line**

**Exhibit 2:**      **Affidavit in Support of C-Line (and other lines)**

**Exhibit 3:**      **Exhausted Investigative Techniques related to Gary Charles Horton**

**Exhibit 4:**      **Ex Parte Order Authorizing Interceptions over C-Line**

**Exhibit 5:**      **Ex Parte Order Authorizing Interceptions over C-Line**

**Exhibit 6:**      **Report of Investigation related to F-Line and E-Line**

**Exhibit 7:**      **Order Directing Verizon to furnish assistance to intercept F-Line**

**Exhibit 8:**      **Ex Parte Application for Interception of G-Line**

**Exhibit 9:**      **Affidavit in Support of G-Line and H-Line**

**Exhibit 10:**     **Exhausted Investigative Techniques related to Albert James Linton**

**Exhibit 11:**     **Ex Parte Order Authorizing Interceptions over G-Line**

**Exhibit 12:**     **Report of Investigation related to I-Line**

**Exhibit 13:**     **Order Directing T-Mobile to furnish assistance to intercept I-Line**

**Exhibit 14:**     **Second Ex Parte Application for Interception of C-Line**

**Exhibit 15:**     **Second Affidavit in Support of C-Line (and other lines)**

**Exhibit 16:**     **Second Exhausted Investigative Techniques related to Gary Charles Horton**

**Exhibit 17:**     **Second Ex Parte Order Authorizing Interceptions over C-Line**

**Exhibit 18:**     **Second Ex Parte Order Authorizing Interceptions over C-Line**

**Exhibit 19:**     **Report of Investigation related to L-Line**

**Exhibit 20:**     **Order Directing Verizon to furnish assistance to intercept L-Line**

**Exhibit 21:**     **Second Ex Parte Application for Interception of G-Line**

**Exhibit 22:**     **Second Affidavit in Support of G-Line, H-Line, and K-Line**

**Exhibit 23:**     **Second Exhausted Investigative Techniques related to Albert James Linton**

**Exhibit 24:**     **Second Ex Parte Order Authorizing Interceptions over G-Line**

**Exhibit 25:**     **Example Minimization Guidelines related to Lines A, B, C, and D**

**Exhibit 26:**     **Search and Seizure Warrant for 103 W. Conway Street, and the person of Gary Horton**

**Exhibit 27:**     **Weekly Progress Reports for all wire lines**

**Exhibit 28:**     **Wire Log for interceptions E-158 through E-181**

**Exhibit 29:**     **Surveillance Report dated October 12, 2018**

**Exhibit 30:**     **Wire Log for interceptions C-128 through C-130**

**Exhibit 31:**     **Wire Log for interception I-12**

**Exhibit 32:**     **Maryland Court of Appeals Order Designating J. Robinson and others as District Court Judges**